Jacquelyn MORGAN and Charles Pettus, Individually and as Heirs to the Estate of Cameron Pettus/Wal–Mart Stores, Inc. d/b/a Wal–Mart, Appellants,

v.

WAL–MART STORES, INC. d/b/a Wal–Mart/Jacquelyn Morgan and Charles Pettus, Individually and as Heirs to the Estate of Cameron Pettus, Appellees.

No. 03–99–00700–CV.

Court of Appeals of Texas, Austin.

Aug. 10, 2000.

**456**

Jennifer Bruch Hogan, Hogan Dubose & Townsend, L.L.P., Houston, for appellants.

Douglas W. Alexander, Scott, Douglass & McConnico, L.L.P., Austin, for Wal–Mart.

Before Justices JONES, YEAKEL and PATTERSON.

JAN P. PATTERSON, Justice.

The issue presented is whether pharmacists have a duty under Texas law to warn of potentially adverse reactions to prescription drugs. Jacquelyn Morgan and Charles Pettus ("plaintiffs") sued Wal–Mart Stores, Inc. individually and as heirs to the estate of their minor child, Cameron Pettus. Plaintiffs alleged that Cameron's death in August 1993 was caused by an adverse reaction to Desipramine, a prescription drug sold to Morgan for Cameron's use by a Wal–Mart pharmacist. A jury found that Wal–Mart's negligent failure to warn of the known dangers of Desipramine was a proximate cause of Cameron's death, and the trial court assessed actual damages of $1,012,000, together with pre- and post-judgment interest. We reverse the judgment of the trial court and render a take-nothing judgment in favor of Wal–Mart.

## FACTUAL BACKGROUND

Jacquelyn Morgan gave birth to Cameron Pettus on January 31, 1979. After her divorce from Cameron's father Charles in 1985, Morgan was awarded managing conservatorship of Cameron and his older sister Regina. In 1989, Cameron began sixth grade at Cornerstone Christian School in Leander. Morgan, who taught both fifth and sixth grade at Cornerstone, was his teacher. Morgan testified that through various school-related seminars and workshops, she had become aware of and interested in Attention Deficit Hyperactivity Disorder ("ADHD"). As Cameron's teacher, she began to notice that he exhibited what she perceived as behavior consistent with ADHD, such as hyperactivity, difficulty completing assigned tasks, and difficulty remaining quiet. Seeking a professional's opinion, Morgan took Cameron to Neil King, a psychologist who had previously evaluated other students at Cornerstone for ADHD.

King told Morgan that the information she provided him about Cameron's behavior indicated that Cameron had ADHD, and he asked whether she would like to try a course of medication. Morgan agreed. King also asked Morgan if Cameron experienced mood swings. Based on her affirmative answer, King recommended Desipramine, which he described as an antidepressant effective in controlling mood swings in children. King suggested Morgan make an appointment with Dr. Lorraine Schroeder to obtain a prescription for Desipramine.

Morgan met with Dr. Schroeder on April 26, 1991. In her deposition, Schroeder testified that she and Morgan discussed several medications, including Ritalin, Dexedrine, Cylert, and Desipramine. Schroeder testified that Morgan stated her brother was taking Desipramine for adult ADHD, and Schroeder told Morgan her son was taking Imipramine, which is chemically similar to Desipramine. Schroeder further testified that she showed Morgan an entry for tricyclic antidepressants in the Physician's Desk Reference.[1] The entry described common side effects associated with the group of antidepressants, such as dry eyes and mouth and increased pulse rate. Schroeder also explained to Morgan that she watched her own son closely for rapid heartbeat. Based on her own knowledge of Desipramine and Morgan's familiarity with the drug, Schroeder prescribed Desipramine for Cameron.[2]

Cameron began taking Desipramine in April 1991 at age twelve after Morgan purchased the drug at a Walgreen's pharmacy. Morgan testified that the pharmacist did not provide her with any information about the drug, nor did she ask any questions of the pharmacist.

In June 1991, Morgan took Cameron to a Pro Med minor emergency center after he complained of chest and groin pain. The doctor at Pro Med told Morgan that Cameron was probably experiencing "musculoskeletal" pain related to his participation in sports. Morgan testified that when she informed Dr. Schroeder of the Pro Med visit, Schroeder agreed with the Pro Med doctor's diagnosis and did not express any concern about Cameron's use of Desipramine.

In September 1991, Cameron again complained of chest pains. Morgan took him to the Round Rock Hospital emergency room where he was diagnosed with pleurisy. Morgan testified that she found this diagnosis curious because she understood pleurisy to be a secondary illness that typically followed a primary illness. The treating physician at the hospital told Morgan that Cameron's condition would "clear up on its own." Morgan informed the doctors at the hospital that Cameron was taking Desipramine, but they did not attribute Cameron's chest pains to the drug.

On August 21, 1992, Morgan requested a transfer of Cameron's prescription from Walgreen's to Wal–Mart because Wal–Mart was less expensive. Morgan testified that when she went to Wal–Mart to pick up the medication, she "walked in and asked for the prescription for Cameron. And the checkout person gave me the prescription and charged me the money for it and I left and went home." The parties agree that no Wal–Mart pharmacist orally counseled Morgan about Desipramine's possible side effects; they also agree that Wal–Mart did not give Morgan the drug manufacturer's package insert, which contains substantial technical information about Desipramine, including warnings of potential adverse reactions.[3] Pursuant to

1. Wal–Mart pharmacist Irene Franklin testified that there are approximately ten tricyclic antidepressants currently on the market, including Desipramine, Imipramine, Amitriptyline, Clomipramine, and Pamelor.

2. At trial, Morgan testified that "[Schroeder] told me how to use the medication. She didn't talk to me about any serious adverse reactions at all." Morgan also disputed Schroeder's testimony that Morgan related to her information about an adult brother taking Desipramine.

3. Sidmak Laboratories, Desipramine's manufacturer and distributor, provided the Desipramine package insert to Wal–Mart. The insert contains two full pages of extremely fine print detailing in technical and scientific terminology the drug's clinical pharmacology, indications and usage, contraindications, warnings, precautions, adverse reactions, overdosage, and dosage and administration. The warnings section provides: "USE IN CHILDREN: Desipramine hydrochloride is not recommended for use in children since safety and effectiveness in the pediatric age group have not been established. (See ADVERSE REACTIONS, Cardiovascular)." The adverse reactions section provides:

> Note: Included in the following listing are a few adverse reactions that have not been reported with this specific drug. However,

valid prescriptions from Dr. Schroeder, Morgan purchased Desipramine three more times at Wal–Mart, the last time in February 1993.[4] Morgan testified that at no time did a Wal–Mart pharmacist advise her of anything with respect to the drug.

Irene Franklin, a pharmacist at the Wal–Mart where Morgan purchased Desipramine, testified that during a typical ten-hour shift in 1992 and 1993, she filled about 150 prescriptions. Although Franklin could not recall meeting Morgan, Franklin identified a Wal–Mart business record indicating that on October 24, 1992, she filled a prescription for 25 milligrams of Desipramine for Cameron Pettus. Franklin testified that Wal–Mart computers generate two documents each time a prescription is filled. The first document is a prescription label; the second document contains the patient's receipt and information from a national database about the drug, such as its generic name, common uses, and possible side effects. Franklin testified that it is common prac-tice at Wal–Mart to staple the sheet containing the receipt and drug information to the outside of the bag in which the drug is placed. Morgan specifically denied receiving from Wal–Mart any printed warnings about Desipramine, although she acknowledged that she disposed of all paperwork related to the drug after Cameron's death.

Franklin further testified that it is not uncommon to fill a prescription for a tricyclic antidepressant and that common problems reported by persons taking such drugs are dry eyes, dry mouth, and constipation. Franklin testified that when she filled the Desipramine prescription on October 24, 1992, she was aware the prescription had been transferred from Walgreen's and thus assumed Morgan had already been adequately informed of the proper use and possible side effects of the drug. Therefore, Franklin did not feel it was necessary to give Morgan any warnings beyond those typically found on the pages generated by Wal–Mart's computers.[5]

the pharmacologic similarities among the tricyclic antidepressant drugs require that each of the reactions be considered when desipramine hydrochloride is given.

\* \* \* \*

Cardiovascular: hypotension, hypertension, palpitations, heart block, myocardial infarction, stroke, arrhythmias, premature ventricular contractions, tachycardia, ventricular tachycardia, ventricular fibrillation, sudden death. There has been a report of an "acute collapse" and "sudden death" in an eight-year (18 kg) old male, treated for two years for hyperactivity. There have been additional reports of sudden death in children. (See WARNINGS, Use in Children).

\* \* \* \*

Neurologic: numbness, tingling, paresthesias of extremities, incoordination, alaxin, tremors, peripheral neuropathy, extrapyramidal symptoms, seizures, alteration in EEG patterns, tinnitus.

Anticholinergic: dry mouth, and rarely associated sublingual adenitis, blurred vision, disturbance of accommodation, mydriasis, increased intraocular pressure, constipation, paralytic iteus, urinary retention, delayed micturition, dilatation of urinary tract.

Allergic: skin rash, petechiae, urticaria, itching, photosensitization (avoid excessive exposure to sunlight), edema (of face and tongue or general), drug fever, cross sensitivity with other tricyclic drugs.

Hematologic: bone marrow depressions including agranulocytosis, eosinophila, purpura, thrombocytopenia.

The adverse reactions section also includes psychiatric, gastrointestinal, and endocrine adverse reactions.

4. Plaintiffs do not allege that Wal–Mart inaccurately filled the prescription for Desipramine on any of these occasions.

5. A sample Wal–Mart information sheet for Desipramine was admitted as an exhibit at trial. The sheet lists prescription number, patient's name, doctor's name, drug name, generic name, common uses, "how to use this medicine," cautions, and possible side effects. The side effects section provides:

SIDE EFFECTS, that may go away during treatment, include dry mouth, constipation, blurred vision, drowsiness, dizziness, headache, nausea, unpleasant taste, or an increased appetite especially for sweets. If they continue, or are bothersome, check with your doctor. If you notice effects not listed above, contact your doctor, nurse, or pharmacist.

In July 1993, Cameron visited his father, Charles Pettus, for two weeks.[6] Before Cameron left home, he complained to Morgan of feeling "itchy." Pettus testified that when he picked up Cameron from Morgan's house, he noticed red bumps and a large scrape on Cameron's legs. Cameron attributed the bumps to mosquito bites he had received while camping and the scrape to a bicycle accident. During his visit with Pettus, Cameron complained of a lump near his groin. Pettus took Cameron to a Pro Med clinic on July 16, 1993. Pettus testified that Cameron told the treating physician that he was taking Desipramine to treat his ADHD. The doctor concluded that Cameron had an infected lymph node from the mosquito bites and prescribed antibiotics. Pettus purchased the antibiotics at an Albertson's grocery store pharmacy. He testified that Cameron told the pharmacist he was taking Desipramine, but Pettus could not recall the pharmacist expressing any particular concern.

Pettus further testified that the wounds on Cameron's legs darkened over the next several days. During the early morning hours of July 19, 1993, Cameron awoke complaining of pain in his chest and penis. Pettus drove Cameron to Seton Northwest Hospital. After taking x-rays, running tests on Cameron's blood, and placing him on an I.V., the physicians told Pettus that Cameron was dehydrated, which Pettus found unusual because Cameron was an active child who drank "tons of fluid all the time."

The next night, Cameron again complained of chest pains and numbness in one of his arms, and Pettus returned to Seton. After an examination, one of the doctors took Pettus aside and suggested that Cameron was imagining his ailments. Pettus returned Cameron to Morgan the next day. Pettus testified he never informed Dr. Schroeder of Cameron's health problems nor did he speak to Morgan about Cameron's medical problems, although he did send the paperwork he had received at Pro Med and Seton with Cameron so he could give it to Morgan.

Upon Cameron's return home, Morgan observed the large, dark wounds on his legs. Cameron told Morgan he had been to the emergency room and was taking antibiotics. Cameron's condition worsened overnight, so the next morning Morgan called Dr. Schroeder, who was unavailable. Dr. Woodall, an associate of Dr. Schroeder's at PCA Medical Group of Texas, agreed to examine Cameron. After receiving the results of chest x-rays and blood work, Woodall instructed Morgan to immediately take Cameron to Brackenridge Children's Hospital.

The next day, July 23, a surgeon at Brackenridge removed one of Cameron's lymph nodes. The surgeon told Morgan that Cameron would be fine, although he expressed surprise that the lymph node was "necrotic, blackened and dead" rather than swollen. Shortly after surgery, Cameron became extremely agitated and scared. He told Morgan he needed to go to the bathroom and that he felt like he was dying. Attempts to put an I.V. into his arm failed, and nurses were forced to give him a groin I.V. Soon thereafter, Cameron slipped into a coma. On August 2, 1993, Cameron was declared brain dead and removed from life support.

Dr. James Sharp prepared a report that day in which he concluded that Cameron died of "[h]ypereosinophilic syndrome, a multi-system disease with primary organ systems involved being his liver, kidney and central nervous system." Morgan and Pettus allowed Dr. Roberto Bayardo to

---

6. Pettus testified that during one of Cameron's weekend visits before the July 1993 visit, he and Cameron had discussed Desipramine. Pettus stated that Cameron told him the drug "made him feel weird, slowed him down." Pettus testified he told Cameron that "if I was taking something and [it] made me feel weird, slowed me down, where I wasn't myself, I would personally not take it." Pettus further testified that during Cameron's July 1993 visit, he could not recall seeing Cameron take any medication.

perform an autopsy on Cameron. Dr. Bayardo also opined that Cameron died of hypereosinophilic syndrome, which he described as "a syndrome that consists of a high number of eosinophils in the blood, also in the bone marrow.[7] And as a result of that, there is involvement of the heart, the lungs, the liver and several other internal organs." Bayardo concluded that Cameron suffered the hypereosinophilic syndrome as a result of taking Desipramine.[8]

In their original petition filed June 26, 1995, plaintiffs sued Dr. Schroeder, Dr. Woodall, PCA Medical Group of Texas, Neil King, Sidmak Laboratories, Walgreen's, and Wal–Mart. Plaintiffs later amended their petition to name several other defendants.[9] Before trial began in March 1999, plaintiffs settled or dismissed their claims against Dr. Schroeder; Dr. Woodall; PCA Medical Group of Texas; Neil King; Sidmak Laboratories; Walgreen's; and Terence MacConnell, M.D., individually and d/b/a Pro Med, leaving Wal–Mart as the only remaining defendant.

In their amended petition, plaintiffs alleged Wal–Mart was negligent in the sale of Desipramine "by failing to properly

warn intended users of the hazards and harms associated with the use of the product." Plaintiffs contended that Wal–Mart's negligence was the proximate cause of Cameron's health problems and death, as well as their own mental anguish, loss of consortium, and loss of family relationship. After a three-day trial, the jury was asked whether the death of Cameron Pettus was proximately caused by the negligence of any of the following parties: Wal–Mart, Walgreen's, Dr. Schroeder, Jacquelyn Morgan, or Charles Pettus. The jury answered affirmatively in each case and apportioned responsibility for Cameron's death in the following manner: Dr. Schroeder—60%; Wal–Mart—15%; Walgreen's—14%; Morgan—9%; Pettus—2%. Based on these answers and the jury's answers to the damage questions, the trial court ordered that Morgan and Pettus, as heirs to the estate of Cameron Pettus, recover $674,500 in actual damages from Wal–Mart. The trial court also ordered that both Morgan and Pettus individually recover $168,750.

On appeal, Wal–Mart argues that as a matter of law its pharmacists had no duty to warn of the potential dangers of Desipramine because that duty rested with the

---

7. Dr. Henry Clayman, a professor of medicine in immunology at the University of Colorado Medical School, explained at trial that eosinophils are a component of the white blood cell count. Clayman stated that it is normal for a patient's eosinophils to comprise up to 5% of the total white blood cell count. A patient with an eosinophil count in excess of 5% is described as having eosinophilia; hypereosinophilia is a term used to describe an even greater presence of eosinophils. Dr. Sharp's August 2 report states that on July 23, 30% to 45% of Cameron's white blood cells were eosinophils.

8. At trial, Dr. Clayman testified for the plaintiffs. Based on his review of Dr. Bayardo's autopsy report, the medical records of Brackenridge Hospital, and other documents, he also concluded that Cameron's death was caused by a hypereosinophilic reaction to Desipramine. Dr. Donald Mahoney, a pediatric hematologist/oncologist, testified for Wal–Mart. Mahoney, who described himself as an expert on disorders of white blood cells in

children, stated he found no evidence that Cameron's hypereosinophilic syndrome with corresponding multi-organ failure was caused by an adverse reaction to Desipramine.

9. The other named defendants are as follows: Brackenridge Hospital; Daughters of Charity Health Services of Austin d/b/a Seton Northwest; Round Rock Hospital, Inc. d/b/a Round Rock Hospital a/k/a Epic Healthcare Management Company a/k/a Epic Healthcare Services, Inc.; Arthur Boone, M.D.; Terence P. MacConnell, M.D., individually and d/b/a Pro Med Emergency Centers d/b/a Pro Med–N d/b/a Pro Med North d/b/a Pro Med South; Sangetta Agrawala, M.D.; Capitol Anesthesiology Association; Lawrence C. Dill, M.D.; Lefayne Hodde, M.D.; Manuel Martin, M.D.; Asma Siddiqui, M.D.; Richard Covey, C.R.N.A.; and Robert W. Porter, M.D. Of these additional defendants, only Terence MacConnell, M.D., individually and d/b/a Pro Med Emergency Centers d/b/a Pro Med–N d/b/a Pro Med North d/b/a Pro Med South was ever served with citation in this cause.

prescribing physician. Wal–Mart further contends that even if it did owe such a duty, there is legally and factually insufficient evidence to prove that Wal–Mart's failure to warn was a proximate cause of damages. Jacquelyn Morgan and Charles Pettus also appeal, arguing that there is legally insufficient evidence to support the jury's findings that their negligence proximately caused Cameron's death.

## DISCUSSION

■ A common law negligence action has three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *See Praesel v. Johnson,* 967 S.W.2d 391, 394 (Tex.1998). Thus, the threshold question in this case is whether Wal–Mart owed a legal duty to the plaintiffs to warn of the risks associated with Cameron's use of Desipramine. Whether a duty exists is a question of law for the reviewing court to decide under the facts surrounding the occurrence in question. *See Lefmark Management Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997). If no duty exists, there can be no negligence liability.

■ In filling and refilling prescriptions, pharmacists are required to exercise the high degree of care that a very prudent and cautious person would exercise under the same or similar circumstances in that business. *See Burke v. Bean,* 363 S.W.2d 366, 368 (Tex.Civ.App.—Beaumont 1962, no writ); *see also Speer v. United States,* 512 F.Supp. 670, 679 (N.D.Tex.1981) (citing *Burke* ). This Court has held that pharmacists owe purchasers of prescription medication "the highest practicable degree of prudence, thoughtfulness and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of the business in order that hu-

man life may not constantly be exposed to the danger flowing from the substitution of deadly poisons for harmless medicines." *Dunlap v. Oak Cliff Pharmacy Co.,* 288 S.W. 236, 237 (Tex.Civ.App.—Austin 1926, writ ref'd). A pharmacist who inaccurately fills a prescription is therefore liable to the customer for resulting harm.[10]

While it is apparent then that Wal–Mart owed the plaintiffs a duty to dispense Desipramine in accordance with Dr. Schroeder's prescription, no Texas court has yet considered whether a pharmacist is also obligated to warn customers of potential hazards or side effects of prescribed drugs. *See* Alison G. Myhra, *The Pharmacist's Duty to Warn in Texas,* 18 Rev. Litig. 27, 32 (1999). A majority of courts considering this question have held that a pharmacist has no such duty when the prescription is proper on its face and neither the physician nor the manufacturer has required that the pharmacist give the customer any warning. *See* David J. Marchitelli, Annotation, *Liability of Pharmacist Who Accurately Fills Prescription for Harm Resulting to User,* 44 A.L.R.5th 393, 411–20, 470–75 (1996); 28 C.J.S. *Drugs and Narcotics* § 52 (1996); 25 Am. Jur.2d *Drugs and Controlled Substances* §§ 239, 241 (1996). The reluctance of courts to hold pharmacists liable for injuries caused by drugs accurately dispensed according to the terms of a valid prescription can be attributed to the application of the "learned intermediary" doctrine, which typically acts as an exception to a manufacturer's duty to warn customers in products liability cases. *See* Steven W. Huang, *The Omnibus Reconciliation Act of 1990: Redefining Pharmacists' Legal Responsibilities,* 24 Am. J.L. and Med. 417, 423 (1998); *see also* Restatement (Second) of Torts § 402A cmt. k (1965).

---

10. *See Burke,* 363 S.W.2d at 367–68 (pharmacist sold Oxsoralen capsules to patient instead of prescribed Oxacholin tablets); *Peavy v. Hardin,* 288 S.W. 588, 588–89 (Tex.Civ.App.—El Paso 1926, no writ) (pharmacist filled coco quinine prescription with coco quinidine); *Dunlap,* 288 S.W. at 236–38 (pharmacist filled prescription for Seilers antiseptic tablets with Diamond antiseptic tablets, a highly poisonous bichloride of mercury).

■ According to this doctrine, the manufacturer of a prescription drug has a duty to adequately warn the prescribing physician of the drug's dangers. The physician, relying on his medical training, experience, and knowledge of the individual patient, then chooses the type and quantity of drug to be prescribed. *See Rolen v. Burroughs Wellcome Co.*, 856 S.W.2d 607, 609 (Tex.App.—Waco 1993, writ denied). The physician assumes the duty to warn the patient of dangers associated with a particular prescribed drug. *See id.; see also Alm v. Aluminum Co.*, 717 S.W.2d 588, 591–92 (Tex.1986); *Reyes v. Wyeth Lab.*, 498 F.2d 1264, 1276 (5th Cir.1974) (doctor understands dangers involved in use of given drug and therefore acts as learned intermediary between manufacturer and patient).

A leading case in which the learned intermediary doctrine was applied to a negligence action against a pharmacy is *McKee v. American Home Products Corp.*, 113 Wash.2d 701, 782 P.2d 1045 (1989). In *McKee*, the plaintiff received prescriptions from her doctor for an appetite suppressant known as Plegine. *See* 782 P.2d at 1046. The Physician's Desk Reference entry for Plegine cautions that it is a potentially addictive amphetamine; therefore, its use should be discontinued within a few weeks to avoid addiction. *See id.* Not-

withstanding, McKee's doctor authorized refills of the drug for ten years, and two pharmacists filled the prescriptions without warning McKee of the possible side effects of extended use. *See id.* at 1047. McKee sued the drug manufacturer, the prescribing physician, and the pharmacists for damages sustained as a result of her addiction to Plegine. *See id.* McKee argued that her pharmacists were negligent in selling her Plegine without warning of its adverse effects and for failing to provide her the drug manufacturer's package insert. *See id.*

In a 5–4 decision, the Washington Supreme Court concluded that the learned intermediary doctrine, normally applied to the relationship among physician, patient, and manufacturer, applied with equal force to the relationship among physician, patient, and pharmacist. *See id.* at 1050–51. The court reasoned that in both circumstances, the physician was in the best position to "relate the propensities of the drug to the physical idiosyncrasies of the patient."[11] *Id.* at 1050. The court therefore held that McKee's pharmacists did not have a duty to warn her of the dangerous propensities of Plegine, nor were they legally obligated to give her the drug manufacturer's package insert containing such warnings.[12] *See id.* at 1054–55.

11. *See also Nichols v. Central Merchandise, Inc.*, 16 Kan.App.2d 65, 817 P.2d 1131, 1133 (1991) (applying learned intermediary doctrine to negligence case against pharmacist); *Leesley v. West*, 165 Ill.App.3d 135, 116 Ill. Dec. 136, 518 N.E.2d 758, 762–63 (1988) (neither drug manufacturer nor pharmacist can be reasonably expected to know medical history or condition of individual patient); *Ingram v. Hook's Drugs, Inc.*, 476 N.E.2d 881, 885 (Ind.Ct.App.1985) (same); *Kinney v. Hutchinson*, 449 So.2d 696, 698 (La.Ct.App. 1984) (same).

12. For a detailed discussion of a pharmacist's duty with respect to manufacturers' package inserts, see *Laws v. Johnson*, 799 S.W.2d 249, 251–55 (Tenn.Ct.App.1990). Laws was prescribed Timoptic, a prescription liquid eye drop medication. *See* 799 S.W.2d at 249. The plastic bottle containing the drug was sent to the pharmacy by Merck, the manufac-

turer, in a small cardboard box with a printed insert. *See id.* The insert contained the technical information and warnings typical of a manufacturer's package insert, including a warning of potential adverse cardiovascular reactions. *See id.* at 249–50. Before dispensing the Timoptic, the pharmacists removed the insert. *See id.* at 250. After experiencing a heart attack, Laws sued the pharmacists alleging they were guilty of negligence for removing the insert. *See id.*

Relying on the learned intermediary doctrine, the Tennessee court of appeals held that the removal of the insert did not wrongfully deprive Laws of warnings concerning his medication. *See id.* at 254. The court emphasized that its decision did not abrogate a patient's right to know; it merely identified the physician as the party with the duty to pass the manufacturer's warnings on to the patient. *See id.; see also Walker v. Jack Eckerd Corp.*,

This holding is consistent with the decisions of many other states that have addressed the issue of whether to impose on pharmacists a duty to warn of adverse side effects. For example, in *Pysz v. Henry's Drug Store*, 457 So.2d 561 (Fla.Dist.Ct. App.1984), a pharmacist had filled the plaintiff's prescription for Quaaludes for more than nine years. *See* 457 So.2d at 561. Pysz alleged that the pharmacist's failure to warn him of the addictive propensities of Quaaludes constituted negligence. The Florida appeals court stated that although a pharmacist might in some instances possess greater knowledge than a physician of the adverse effects of drugs, "it is the physician who has the duty to know the drug that he is prescribing and to properly monitor the patient." *Id.* at 562. The court concluded that the pharmacist, who had properly filled a lawful prescription, had no duty to warn the plaintiff of adverse reactions and affirmed the trial court's dismissal of Pysz's complaint.[13] In an effort to limit its decision to the facts before it, the court noted, without elaboration, that it could conceive of a factual situation that would support a plaintiff's claim of negligence against a pharmacist who lawfully filled a valid prescription. *See id.*

In *Stebbins v. Concord Wrigley Drugs, Inc.*, 164 Mich.App. 204, 416 N.W.2d 381 (1987), Bonnie Stebbins was seriously injured when a car driven by a man taking the antidepressant Tofranil struck her car. *See* 416 N.W.2d at 383. Stebbins settled with the other driver and sued his prescribing physician and pharmacist for negligence, alleging that they had failed to warn the patient of Tofranil's side effects, which include drowsiness. *See id.*

The Michigan appeals court began its consideration of the pharmacist's liability by citing the general rule that pharmacists owe patients a high standard of care in filling prescriptions and may be held liable for negligently dispensing a drug other than that prescribed. *See id.* at 387. Relying on *Pysz*, the court concluded that "a pharmacist has no duty to warn the patient of possible side effects of a prescribed medication where the medication is proper on its face and neither the physician nor the manufacturer has required that any warning be given to the patient by the pharmacist." *Id.* at 387–88.[14] The court emphasized that its decision did not apply to a situation in which a pharmacist knows of a particular patient's unique medical problems or where a pharmacist fills incompatible prescriptions. *See id.* at 388.

The courts of Illinois have likewise refused to impose on pharmacists a duty to warn of adverse side effects. In *Jones v. Irvin*, 602 F.Supp. 399 (S.D.Ill.1985), the plaintiff alleged she had suffered injuries as a result of her consumption of an excessive amount of Placidyl and other prescribed drugs. The Illinois district court concluded that K–Mart had no duty to notify the customer that she was being overmedicated because the duty to warn of a prescription drug's adverse effects falls squarely on the prescribing physician. *See* 602 F.Supp. at 402. Furthermore, the

209 Ga.App. 517, 434 S.E.2d 63, 67–68 (1993) (no duty to warn imposed on pharmacists who are provided with manufacturers' literature warning of potential adverse effects if certain drug dosages are exceeded).

13. *See also Ramirez v. Richardson–Merrell, Inc.*, 628 F.Supp. 85, 87–88 (E.D.Pa.1986); *Bichler v. Willing*, 58 A.D.2d331, 397 N.Y.S.2d 57, 58 (N.Y.App.Div.1977) (pharmacist who fills prescription as directed by physician has no duty to warn patient of dangerous adverse reactions); *Batiste v. American Home Prods. Corp.*, 32 N.C.App. 1, 231 S.E.2d 269, 274 (1977) (same).

14. *See also Adkins v. Mong*, 168 Mich.App. 726, 425 N.W.2d 151, 153 (1988) (no duty on part of pharmacist to monitor and intervene in customer's reliance on drugs prescribed by licensed physician). *But see Baker v. Arbor Drugs, Inc.* 215 Mich.App. 198, 544 N.W.2d 727, 731 (1996) (defendant pharmacy may voluntarily assume a duty to warn by advertising computer system that monitors customers' medication profiles for adverse drug interactions).

court placed upon the patient the duty to notify the physician of other drugs the patient is taking and upon the drug manufacturer the duty to notify the physician of any adverse effects in administering the drug. *See id.* The court concluded that "[p]lacing these duties to warn on the pharmacist would only serve to compel the pharmacist to second guess every prescription a doctor orders in an attempt to escape liability." *Id.* As in *Pysz* and *Stebbins*, the district court stressed the narrow application of its holding, stating that it applied only to prescription drugs and that pharmacists still owed customers the highest degree of prudence in filling a prescription. *See id.* at 402–03.

When faced with the same issue, Illinois state courts also refused to impose a duty to warn on pharmacists. *See Frye v. Medicare–Glaser Corp.*, 153 Ill.2d 26, 178 Ill.Dec. 763, 605 N.E.2d 557 (1992); *Kirk v. Michael Reese Hosp.*, 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387 (1987); *Fakhouri v. Taylor*, 248 Ill.App.3d 328, 187 Ill.Dec. 927, 618 N.E.2d 518 (1993); *Eldridge v. Eli Lilly & Co.*, 138 Ill.App.3d 124, 92 Ill.Dec. 740, 485 N.E.2d 551 (1985). In *Eldridge*, the plaintiff's wife died of an overdose of prescription drugs. *See* 92 Ill.Dec. 740, 485 N.E.2d at 552. He sued the pharmacy that filled her prescriptions, alleging that it had been negligent in dispensing drugs in quantities beyond those normally prescribed. In rejecting the plaintiff's claim, the court adopted the reasoning in *Jones*, noting that placing on pharmacists the duty urged by the plaintiff would require pharmacists to learn of the customer's condition and monitor drug us-

age, functions the court concluded were more appropriately undertaken by physicians.[15] *See id.* at 553.

In *Fakhouri*, the appellate court of a different district reached the same conclusion with respect to a wrongful death claim brought against a K–Mart pharmacy. The plaintiff alleged K–Mart had been negligent in failing to warn the deceased that his prescription for Imipramine was in excess of the manufacturer's recommended limits. *See* 187 Ill.Dec. 927, 618 N.E.2d at 519. The court, relying on the learned intermediary doctrine, refused to impose upon K–Mart a duty to warn of excessive prescriptions. The court held:

> To impose a duty to warn on the pharmacist would be to place the pharmacist in the middle of the doctor-patient relationship, *without* the physician's knowledge of the patient. Furthermore, under Illinois law, the duty of the manufacturer runs to the physician and not to the patient. Therefore, it is illogical and unreasonable to impose a greater duty on the pharmacist who properly fills a prescription than is imposed on the drug's manufacturer.

*Id.* at 521 (citations omitted).

In *Kirk*, the Illinois Supreme Court was asked to determine whether a hospital negligently failed to warn a patient that prescribed drugs would diminish his ability to safely operate an automobile. *See* 111 Ill.Dec. 944, 513 N.E.2d at 391. The court stated that the determination of whether a duty exists is an issue of law and that one factor to be taken into account in making the determination is whether the harm suffered by the plaintiff was reasonably

**15.** The plaintiff in *Eldridge* also alleged that the Illinois Pharmacy Practice Act, which provides that pharmacists are to dispense medications "in good faith," imposed on pharmacists a duty to warn. Although "good faith" as used in that context was defined by the Illinois legislature to include a consideration of unusual dosages and the like, the court concluded that the statute imposed no duty to warn. *See* 92 Ill.Dec. 740, 485 N.E.2d at 554. For similar rejections of statutory arguments, see *Fakhouri*, 187 Ill.Dec. 927, 618 N.E.2d at

521–22 (noting that legislature, by providing that Illinois Pharmacy Practice Act was not meant to interfere with lawful practice of physicians, dictated that physicians, not pharmacists, have duty to decide which drugs to prescribe); *Ingram*, 476 N.E.2d at 884–85 (language in the definition of "practice of pharmacy" concerning pharmacist giving advice does not create mandatory duty to warn); *Kampe v. Howard Stark Professional Pharmacy, Inc.*, 841 S.W.2d 223, 225–26 (Mo.Ct.App. 1992) (same).

foreseeable. *See id.* at 396. Because there was no allegation that the hospital knew or had reason to know that drug warnings were not given to the patient by his prescribing physician, the court held that the hospital had no duty to warn the patient of the dangers of using the drug. *See id.*

In *Frye,* the plaintiff alleged that although the pharmacy had no initial duty to warn of adverse side effects, it voluntarily undertook such a duty by placing a warning label on the prescription drug container. *See* 178 Ill.Dec. 763, 605 N.E.2d at 558. The pharmacist testified by deposition that when a prescription is filled, the pharmacy's computers generate two documents: a container label identifying the patient, prescribing physician, and dosage indicated by prescription, and a document suggesting warning labels that might be affixed to the container. *See id.* at 558–59. The computer suggested three labels warning of drowsiness, impairment of driving ability, and the potential adverse effect of mixing the drug with alcohol. *See id.* at 559. The pharmacist testified that she placed only the "drowsy eye" sticker on the container because in the past customers had reacted negatively to the alcohol sticker. *See id.*

The court rejected the plaintiff's contention that the defendant pharmacy undertook to warn of all the potential dangers in taking the drug by placing a single warning sticker on the package, reasoning that the imposition of such a duty would discourage pharmacists from placing any warning labels on drug containers. *See id.* at 560. The court opined that "consumers should principally look to their prescribing physicians to convey the appropriate warning regarding drugs, and it is the prescribing physician's duty to convey these warning to the patients." *Id.* at 561.

While a majority of courts that have considered whether a pharmacist has a duty to warn a patient of the adverse side effects of prescription medication has rejected the imposition of such a duty, unusual factual situations have arisen in which courts have felt compelled to impose a duty beyond mechanically dispensing drugs pursuant to a physician's directions. For example, in *Hand v. Krakowski,* 89 A.D.2d 650, 453 N.Y.S.2d 121 (N.Y.App. Div.1982), a doctor prescribed certain psychotropic drugs to an alcoholic patient. *See* 453 N.Y.S.2d at 122. The drugs were contraindicated with the use of alcohol. *See id.* at 123. Although its records identified the patient as an alcoholic, the pharmacy dispensed the drugs to her over a period of six years without warning her of the danger. *See id.* at 122. The patient died at age fifty-five of pancreatitis associated with a severe degree of cirrhosis. *See id.*

The New York appellate court reversed the summary judgment granted in favor of the defendant pharmacy. *See id.* at 123. The court held that because the dispensing pharmacists knew that the decedent was an alcoholic and knew, or should have known, that the prescribed drugs were contraindicated with alcohol, a fact question existed regarding whether they had a duty to warn the patient of the danger involved. *See id.*[16]

A Pennsylvania appellate court upheld a jury verdict against a pharmacy in a case

---

16. *See also Lasley v. Shrake's Country Club Pharmacy, Inc.,* 179 Ariz. 583, 880 P.2d 1129, 1132–34 (1994) (whether pharmacist's failure to warn of drug interactions violates duty of care is question of fact for the jury); *Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 517–20 (Ind.1994) (pharmacist has duty to cease refilling prescription if he has personal knowledge that customer is taking medication more quickly than prescribed); *Dooley v. Everett,* 805 S.W.2d 380, 383–86 (Tenn.Ct.App. 1990) (refusing to apply learned intermediary doctrine, court held that whether pharmacist has duty to warn customer of potential drug interaction is issue of fact preventing summary judgment); *Stebbins,* 416 N.W.2d at 388 (suggesting that pharmacist's knowledge of patient's unique medical problems may alter rule that pharmacist has no duty to warn of possible side effects of prescribed medication).

in which a physician omitted in a prescription a statement pertaining to maximum safe dosage. *See Riff v. Morgan Pharmacy*, 353 Pa.Super. 21, 508 A.2d 1247 (1986). A physician prescribed Cafergot suppositories to Patricia Riff to treat her migraine headaches. *See* 508 A.2d at 1249. The prescription instructed her to insert one in the rectum "every four hours for headache." *See id.* Trial testimony showed that the maximum dosage for Cafergot suppositories accepted in the medical literature is two per headache, with no more than five to be used in one week. *See id.* A pharmacist filled the prescription without issuing any additional warnings. *See id.*

Over the next four months, Riff experienced three severe migraine headaches, and she used the suppositories as directed by her physician and pharmacist. *See id.* For the first headache, Riff used three or four suppositories over approximately twelve hours; for the second, she used fifteen to seventeen suppositories over three or four days; for the third headache, Riff used five or six suppositories over two days. *See id.* Soon thereafter, Riff experienced discomfort in her right foot, and doctors determined she was suffering from diminished blood circulation caused by a toxic overdose of Cafergot. *See id.*

The court upheld the jury's verdict finding the pharmacy negligent for failing to warn Riff of the obvious inadequacies appearing on the face of the prescription. *See id.* at 1251–52. In doing so, the court expressly rejected the defendant pharmacy's contention that its only duty was to accurately fill the prescription. *See id.* at 1251.[17]

In sum, courts holding that pharmacists owe their customers a duty beyond accurately filing prescriptions do so based on the presence of additional factors, such as known contraindications, that would alert a reasonably prudent pharmacist to a potential problem.[18] We do not dispute that a pharmacist may be held liable for negligently filling a prescription in such situations, but we cannot discern from the relevant case law a trend towards imposing a more general duty to warn.

■ Nor do we conclude that existing Texas statutory law imposes such a duty. The plaintiffs contend that under the Texas Pharmacy Act and the administrative rules adopted pursuant to the Act, pharmacists have a general duty to warn customers of potential adverse side effects. *See* Tex. Occ.Code Ann. §§ 551.001–566.151 (West 2000). Plaintiffs argue that the duty arises by implication from the mention of "patient counseling" in the Act's definition of "practice of pharmacy," *see id.* § 551.003(33)(D), as well as from several references to pharmacists counseling or communicating with patients in the Administrative Code. *See, e.g.,* 22 Tex. Admin. Code §§ 291.31; 291.33(b)(1)(D), (c)(1)(A), (c)(2)(A)(i)(I); 291.34(c)(3); 291.36(c)(2)(B)(iv), (d)(3)(A)(i)(IV) (2000).

---

**17.** *See also Heredia v. Johnson,* 827 F.Supp. 1522, 1525 (D.Nev.1993) (while generalized duty to warn is inappropriate, pharmacist's duty of due care necessarily includes duty to fill prescriptions as prescribed, properly label them, and be alert for "plain error"); *Gassen v. East Jefferson Gen. Hosp.,* 628 So.2d 256, 258 (La.Ct.App.1993) (pharmacist has no duty under Louisiana law to warn patient of adverse reactions but does have limited duty to "inquire or verify from prescribing physician clear errors or mistakes in the prescription").

**18.** *See, e.g., Hand,* 453 N.Y.S.2d at 123 (contraindications); *Riff,* 508 A.2d at 1251 (obvious errors on the face of the prescriptions);

*Dooley,* 805 S.W.2d at 386 (incompatible prescriptions); *Pittman v. Upjohn Co.,* 890 S.W.2d 425, 435 (Tenn.1994) (special instructions given by manufacturer to pharmacist to warn patient of potential adverse reactions). That such factors might lead to the imposition of negligence liability, even in cases in which a pharmacist lawfully fills a valid prescription, was anticipated by the Michigan appeals court in *Stebbins* and the Florida appeals court in *Pysz. See supra* pp. 463–464. Furthermore, the Supreme Court of Washington in *McKee* expressly stated that pharmacists have a duty "to be alert for clear errors or mistakes in the prescription." 782 P.2d at 1055.

Plaintiffs emphasize the Code's repeated references to pharmacists communicating to patients information regarding "common severe side effects or adverse effects or interactions." *Id.* §§ 291.33(c)(1)(A)(i)(iv); 291.36(d)(3)(A)(i)(IV).

While these administrative rules demonstrate that pharmacists in Texas are trusted professionals with varied and important responsibilities, they cannot be reasonably read to impose a legal duty to warn patients of the adverse effects of prescription drugs. The imposition of a generalized duty to warn would unnecessarily interfere with the relationship between physician and patient by compelling pharmacists seeking to escape liability to question the propriety of every prescription they fill. Furthermore, a patient faced with an overwhelming number of warnings from his or her pharmacist may decide not to take a medication prescribed by a physician, who has greater access to and knowledge of the patient's complete medical history and current condition than the pharmacist. Instead of imposing such an onerous and counter-productive duty, the administrative rules reinforce the notion that although pharmacists act as final auditors of the technical accuracy of a prescription and its appropriateness with respect to a patient's known condition and medication record, they do not possess the extensive knowledge of a physician with respect to a patient's complete medical history and are thus not legally obligated to warn a patient of adverse drug reactions.[19]

■ Therefore, we hold that any liability of Wal–Mart's for negligently filling Cameron's prescription for Desipramine must be based on neglect in the face of information on which a reasonably prudent pharmacist would have acted. Having reviewed the entire record, we find no basis to conclude that the Wal–Mart pharmacists breached their duty of care when they filled Cameron's prescription for Desipramine.

Dr. Schroeder prescribed Desipramine to treat Cameron's ADHD. Cameron's mother Jacquelyn Morgan filled the prescription first at Walgreen's, then at Wal–Mart. There is no evidence that Sidmak Laboratories, the manufacturer and distributor of Desipramine, gave any special instructions to pharmacies such as Wal–Mart to warn patients of potential adverse reactions to the drug. Moreover, although Cameron experienced severe discomfort while taking Desipramine, at no time did even one of the many doctors that examined him warn Cameron, Morgan, or Pettus of the potential adverse side effects of Desipramine or contact the pharmacists to instruct them to give such a warning. Indeed, the record reveals that the doctors did not attribute Cameron's ailments to Desipramine at all.

■ Furthermore, it is undisputed that Wal–Mart sold Desipramine to Morgan according to the terms of Dr. Schroeder's prescription. Plaintiffs do not allege that Wal–Mart possessed any special knowledge of Cameron's medical history that would impose upon it an additional duty to warn him, Morgan, or Pettus of the particular dangers of Desipramine. Nor do the plaintiffs contend that Wal–Mart was or should have been aware of any contraindications. Plaintiffs instead argue that the prescription contained a "clear error" because the Desipramine package insert, in a section labeled "Warnings," provides that the drug "is not recommended for use in *children* since safety and effectiveness in the pediatric age group have not been established." (Emphasis added.) Plaintiffs contend that Cameron was a child as contemplated by this warning and that therefore Wal–Mart negligently dispensed

---

19. *See, e.g.,* Tex. Occ.Code Ann. § 157.001 (West 2000) (physician may delegate to pharmacist acting under physician's supervision the performance of specific acts of drug therapy management); Tex. Admin. Code § 291.33(b)(2)(B)(i) (pharmacists may provide drug therapy management as delegated by a physician).

to him a product it knew or should have known was inappropriate.

The "Dosage and Administration" section of the package insert provides: "Not recommended for use in children. Lower dosages are recommended for elderly patients and *adolescents*." (Emphasis added.) The insert further provides that "[t]he usual adolescent and geriatric dose is 25 to 100 mg daily." Clearly, there is a recognized pharmacological distinction between children and adolescents. The question then is whether there was evidence presented at trial to prove that at the time Wal–Mart sold Morgan Desipramine for Cameron's use, Cameron was a child.

Cameron was twelve years old when he began taking Desipramine in April 1991. When Wal–Mart first sold Morgan the drug for Cameron's use, Cameron was thirteen years old. When Wal–Mart filled the prescription for the fourth and final time in February 1993, Cameron was fourteen years old. The plaintiffs' pharmacy expert, Dr. Thomas O' Donnell, testified extensively at trial about the responsibilities of a pharmacist in filling a prescription. Dr. O'Donnell was asked by plaintiffs' counsel what the Wal–Mart pharmacist should have done when filling Cameron's prescription to meet the standard of care of a reasonably prudent pharmacist. O'Donnell testified, "I would insist on talking to the mother. Ask what the drug is being used for. I mean, it's an unusual drug in a 12–year–old. *Doesn't mean it can't be used*, but it's an unusual drug. This is a drug that's usually used for depression in adults." (Emphasis added.) Furthermore, O'Donnell agreed that a twelve-to-fourteen year old was an adolescent "from a medical standpoint and as a pharmacist."

The plaintiffs do not address O'Donnell's testimony but rather contend that the testimony of Wal–Mart pharmacist Irene Franklin and pediatric hematologist Dr. Mahoney provides sufficient evidence that Wal–Mart sold Desipramine to Cameron when he was a child and thus breached its duty of care. Wal–Mart specifically points to Franklin's testimony that "children shouldn't be prescribed Desipramine" and Mahoney's assertion that Cameron was a child. We note initially that Franklin's statement does not speak to whether Cameron was a child at the relevant time; it merely echoes the warning from the Desipramine package insert. Furthermore, Mahoney's statement concerning Cameron's classification as a child, when read in context, instead supports Wal–Mart's position that Cameron was an adolescent when he was sold Desipramine. The relevant exchange is as follows:

Q: Doctor was Cameron Pettus a child?

A: He is a—he was an adolescent, yes.

Q: Is there a distinction between children and adolescents?

A: He is under 18. And so, we consider anybody under 18 a child, adolescent, and consider them together in viewing hematologic disorders.

Q: If there is a biologic or drug cause for hypereosinophilia, is it your opinion that the disease or disorder course is going to be different if you are under 18 than if you are over 18?

A: I can only speculate on that. It certainly could be different. Can drug reactions be different in children as opposed to adults? Yes.

Q: So, for your purposes Cameron Pettus was a child and shouldn't be treated like an adult?

A: Correct.

First, we note that Mahoney, who is not a pharmacist, limited the application of his testimony to "viewing hematologic disorders"; the testimony thus has no application to a pharmacist's decision to dispense a drug in accordance with a physician's valid prescription. Next, Mahoney admitted to lumping children and adolescents together in his analysis in order to contrast these groups to adults. Finally, his

testimony about drug reactions emphasizes that he is drawing a distinction not between children and adolescents but between children/adolescents and adults.

Mahoney's testimony therefore is not evidence that Cameron was a child, rather than an adolescent, when Wal–Mart sold Morgan Desipramine for his use. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983) ("When evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.") The only testimony pertaining to this question comes from plaintiffs' pharmacy expert O'Donnell, who unequivocally testified that for pharmalogical purposes, Cameron was an adolescent. We therefore reject the plaintiffs' argument that the prescriptions filled by Wal–Mart contained clear errors or obvious inadequacies triggering a duty to warn.

### CONCLUSION

We acknowledge that the pharmacist's role has changed in the last few decades from a mere dispenser of medication to a trusted professional who plays a vital role in patient treatment. *See Riff*, 508 A.2d at 1251 (pharmacist is much more than "shipping clerk who must dutifully and unquestioningly obey the written order of omniscient physicians"). We understand that modern pharmacies employ advanced computer systems that can analyze drug interactions in seconds, thus preventing the sale of potentially fatal drugs to consumers, and we encourage the use of such systems. Nonetheless, in light of the learned intermediary doctrine, which we find applicable to the relationship among physician, patient, and pharmacist, we hold that pharmacists have no generalized duty to warn patients of potential adverse reactions to prescription drugs absent some special circumstances not present here. We do not imply that pharmacists may not warn patients of potential adverse reactions or dangerous side effects; we merely hold that pharmacists are not legally obligated to do so. We reverse the judgment of the trial court and render a take-nothing judgment in favor of Wal–Mart. Because our resolution of Wal–Mart's first issue resolves this appeal, we need not consider Wal–Mart's causation issue or the plaintiffs' single appellate issue.