COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



DUSTY RAY PAINTER,
INDIVIDUALLY AND AS NEXT
FRIEND OF DEZARAY NICOLE SPEER
AND SUMMER DAWN PAINTER,
MINORS, AND TINA PERKINS,
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE
OF JESSE PERKINS, DECEASED,


 Appellants,


v.


MOMENTUM ENERGY
CORPORATION, McGUIRE
INDUSTRIES, INC., AND XACT
TECHNOLOGIES, INC.,


 Appellees.
§


 


§


 


§


 


§


 


§


 


 § 


§


§


§


No. 08-07-00112-CV



Appeal from the


112th District Court


of Upton County, Texas


(TC# 05-01-U3880-IDO)

(consolidated w/05-04-U3880-IDO)


O P I N I O N


 Appellants, Dusty Ray Painter, Individually and as next friend of minors Dezaray Nicole
Speer and Summer Dawn Painter and Tina Perkins, individually and as representative of the Estate
of Jesse Perkins, deceased, appeal the trial court's grant of summary judgment in favor of
Momentum Energy Corporation, McGuire Industries, Inc. ("McGuire"), and Xact Technologies, Inc. 
We affirm the judgment of the trial court.

I. BACKGROUND


 On August 7, 2004, Jesse Perkins and Dusty Painter were employees of Robinson Drilling
of Texas, Ltd. ("Robinson"), when Perkins was killed and Painter paralyzed after having been struck
by a rotating head that fell from the top of a blowout preventer during disassembly of a drilling rig
at the Lindsey No. 1 well site in Upton County. Robinson had been hired by Momentum, the
operator, to drill a well, pursuant to an IADC Drilling Bid Proposal and Footage Drilling Contract
(the "Drilling Contract").

 Momentum, the 100 percent owner of the leasehold working interest of the relevant mineral
property, hired Xact to provide a contract representative to oversee certain aspects of the operation,
including the running of casings, cementing the casings, setting the slips, electric logging, and drill-stem testing. Xact hired Melvin Fesler to serve as the contract representative for itself and
Momentum.

 On the date of the accident, the well had reached total depth and Robinson employees were
in the process of rigging down the drilling rig. As part of the process, Robinson employees had to
remove the casing from the blowout preventer stack and lay the blowout preventer on the ground. 
The blowout preventer is a large, heavy piece of equipment. The rotating head, a separate piece of
equipment that weighs approximately 2,000 pounds, was bolted to the top of the blowout preventer. 
The blowout preventer was owned by Robinson, while the rotating head was rented from McGuire. 
Painter and Perkins worked on the daylight tour, which ran from 6 a.m. until 2 p.m.

 Robinson employees on the previous shift had removed or loosened some of the bolts 
securing the rotating head to the top of the blowout preventer in anticipation of hoisting it off of the
blowout preventer, before laying the preventer on the ground. At the time of the accident, there
remained two bolts securing the rotating head to the preventer, and the nuts attached to the bolts were
only hand-tightened. The fact that some of the bolts had been removed and others loosened was not
communicated to the members of the daylight tour.

 The daylight tour employees sought to remove the blowout preventer from the rig by
removing it with the rotating head still attached. The daylight crew attached the draw works towards
the top of the blowout preventer in order to lift it, and attached an air hoist to the bottom of the
blowout preventer to pull the lower portion of preventer out and tilt it. The crew then lifted the
blowout preventer, pulled the bottom aside, and began to lay it over. When they did so, the rotating
head fell from the top of the preventer, killing Perkins and severely injuring Painter.

 Painter and Perkins brought suit against Momentum and Xact, based on premises liability, (1)
and against McGuire, based on strict liability, negligence, and breach of warranty. Momentum and
Xact both filed traditional and no-evidence motions for summary judgment. They argued that
chapter 95 (2) of the Texas Civil Practices and Remedies Code applied to the claims against them and
that they were entitled to summary judgment, because there was no evidence that either exercised
control over Robinson and its employees and no evidence that either had actual knowledge of the
danger. Momentum and Xact also filed for summary judgment on common law negligence claims,
in the event that chapter 95 was deemed inapplicable. McGuire moved for traditional and no-evidence summary judgments on all of the claims against it. After a hearing on the various motions,
the trial court granted summary judgment in favor of Momentum, Xact, and McGuire. The trial
court did not specify the grounds for its judgment. (3)

II. DISCUSSION


A. Standard of Review


 The standard of review for a traditional summary judgment asks whether the movant carried
the burden of showing that there is no genuine issue of material fact, so that judgment should be
granted as a matter of law. Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 846 (Tex.
2005); De Santiago v. West Tex. Cmty. Supervision & Corr. Dep't, 203 S.W.3d 387, 398 (Tex. App.
--El Paso 2006, no pet.). Summary judgment is proper if the defendant disproves at least one
element of each of the plaintiff's causes of action, D. Houston, Inc. v. Love, 92 S.W.3d 450, 454
(Tex. 2002), or establishes all elements of an affirmative defense to each claim, Shah v. Moss, 67
S.W.3d 836, 842 (Tex. 2001). Once the movant establishes a right to judgment as a matter of law,
the burden shifts to the non-movant to produce evidence raising a genuine issue of material fact. 
City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678-79 (Tex. 1979). When reviewing
a summary judgment, we take as true all competent evidence favorable to the non-movant, and we
indulge every reasonable inference and resolve any doubts in the non-movant's favor. Southwestern
Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002) (citing Science Spectrum, Inc. v.
Martinez, 941 S.W.2d 910, 911 (Tex. 1997)).

 The Texas Rules of Civil Procedure also permit a party to move for a no-evidence summary
judgment "without presenting summary judgment evidence," but they require the moving party to
"state the elements as to which there is no evidence." Tex. R. Civ. P. 166a(i); Aguilar v. Morales,
162 S.W.3d 825, 834 (Tex. App.--El Paso 2005, pet. denied). The burden then shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding
each element challenged in the motion. Aguilar, 162 S.W.3d at 834.

 A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and
we apply the same legal sufficiency standard of review. King Ranch, Inc. v. Chapman, 118 S.W.3d
742, 750-51 (Tex. 2003), cert. denied, 541 U.S. 1030 (2004). We view the evidence in the light
most favorable to the non-movant, and we must disregard all contrary evidence and inferences. Id.
at 751. A genuine issue of material fact is raised if the non-movant produces more than a scintilla
of evidence regarding the challenged element. Id. There is not a scintilla of evidence when the
evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. Ianni
v. Loram Maint. of Way, Inc., 16 S.W.3d 508, 513 (Tex. App.--El Paso 2000, pet. denied). Evidence
that fails to constitute more than a mere scintilla is, in legal effect, no evidence at all. Lozano v.
Lozano, 52 S.W.3d 141, 148 (Tex. 2001).

B. Momentum's Traditional and No-Evidence Motions for Summary Judgment


 In its no-evidence motion for summary judgment, Momentum argued that chapter 95 of the
Civil Practice and Remedies Code applies to the negligence claims against it and that there was no
evidence that Momentum exercised or retained control over the manner in which Robinson
(including Perkins and Painter) performed their work. (4) Momentum also argued that there was no
evidence that it had actual knowledge of the danger or condition resulting in Perkins' death and
Painter's injury. Momentum argued that, even if chapter 95 were inapplicable, there was no
evidence under a common-law negligence claim that Momentum owed a duty to Perkins and Painter,
and no evidence of any breach of duty by Momentum that proximately caused their injuries.

 Momentum asserted the same grounds with regard to chapter 95 in its traditional motion for
summary judgment. With regard to the negligence claims against it, Momentum argued that it did
not owe a duty to Perkins and Painter, because it did not exercise control, or have contractual control,
over Robinson and its employees.

 As evidence in support of its traditional motion, Momentum attached the affidavit of Melvin
Fesler. In his affidavit, Fesler stated that he was retained as an independent contractor by Xact
Technologies to serve as a contract representative for Momentum on the Lindsey No. 1 Well for the
sole purposes of overseeing the running of the casings, cementing the casings, setting the slips,
electric logging, and drill-stem testing. Fesler stated that, at the time of the accident, Robinson's
employees were in the process of laying down Robinson's blowout preventer and that he was not
retained to oversee or supervise this process. Fesler further stated that he did not, at any time,
exercise or retain control over the manner in which the work was performed by Robinson's
employees in laying down the blowout preventer, including the removal of the bolts or studs that
secured the rotating head. Fesler also stated that, prior to the accident, he was unaware of the
method that Robinson used to remove the rotating head and that he had no actual knowledge of the
danger or condition that resulted in Perkins' death or Painter's injury. Fesler further stated that he
was unaware that anyone had removed or loosened the bolts or studs that secured the rotating head,
that he did not look at or inspect the studs or bolts that secured the rotating head, and that he was
unaware that Perkins and Painter were standing beneath the blowout preventer prior to the accident. 
 Momentum also attached the affidavit of Louie Michael Cure, Xact Technologies' drilling
superintendent at the relevant time period. Cure confirmed that Xact was retained by Momentum
to provide it with a contract representative for the sole purposes of overseeing the running of the
casings, cementing the casings, setting the slips, electric logging, and drill-stem testing. Cure stated
that Fesler was not retained to oversee or supervise Robinson's employees during any work
preparatory to laying down the blowout preventer. Cure further stated that Xact did not exercise or
retain control over the manner in which Robinson performed its work, including the manner in which
Robinson did preparatory work to lay down the blowout preventer, including the removal of studs
or bolts from the rotating head. According to Cure, prior to the accident, Xact had no actual
knowledge of the danger or condition that resulted in Perkins' death and Painter's injury and was not
aware that anyone had removed or loosened the bolts or studs that secured the rotating head. Cure
further stated that Xact was not aware of the method by which Robinson's employees intended to
remove the rotating head and was not aware that Perkins and Painter were standing beneath the head. 
 Momentum also attached the affidavit of Sammie Lynn Hodges, Momentum's operations
foreman during the relevant time period. Hodges stated that Momentum owned record title to 100
percent of the leasehold working interest in the subject mineral estate and that, prior to and at the
time of, the accident, Momentum was using the property for commercial and business purposes. 
Hodges stated that Momentum retained Xact to provide a contract representative at the well for the
sole purposes of overseeing the running of the casings, cementing the casings, setting the slips,
electric logging, and drill-stem testing. Fesler was Momentum's only contract representative and
its only representative present at the well. Hodges further stated that, at no time, did Fesler
communicate with Momentum as to the preparations to lay down the blowout preventer, the method
by which Robinson intended to remove the rotating head, or the removal and loosening of studs and
bolts from the head. Hodges also stated that Momentum did not exercise or retain control over the
manner in which work was performed by Robinson's employees, nor did it retain Xact to do so. 
Hodges stated that Momentum did not have actual knowledge of the method used by Robinson to
remove the rotating head, of the removal and loosening of studs and bolts from the head, or where
Perkins and Painter were standing at the time of the accident. The Drilling Contract between
Momentum and Robinson was attached as an exhibit to the affidavit.

 In their responses to Momentum's motions, Perkins and Painter argued that, because the
Drilling Contract provided that "[o]perator shall be solely responsible and assumes liability for all
consequences of operations by both parties while on a daywork basis," chapter 95 was inapplicable. 
Perkins and Painter also argued that the Drilling Contract provided that daywork labor provided by
Robinson would be under the direction, supervision, and control of Momentum. In addition, they
argued that Fesler was Momentum's company representative, that he exercised actual control over
the manner and means of the operation, that he had actual knowledge of the danger, and that he
failed to adequately warn of the danger.

 Among other things, Perkins and Painter attached the Drilling Contract, billing records from
Xact to Momentum for Fesler's work, and excerpts from the deposition of Martin Spadinger,
Momentum's president. Spadinger testified that Momentum hired Xact to be its company
representative at the well for the daily drilling operations and that such representative was generically
known in the industry as a "company man." Perkins and Painter also attached deposition excerpts
of Robert Robinson, the president of GR Robinson Management, L.C., the managing general partner
of Robinson Drilling of Texas, Ltd., who testified that the company man, if he was with the
toolpusher, had the "ultimate say-so" about the operation as the well was being finished, that he had
the power and responsibility to talk to Robinson's toolpusher about what he wanted done on the rig
at the time of the completion procedures, and that he had the right and the responsibility to dictate
the manner and means of the completion procedures.

 Appellants also attached deposition excerpts from Fesler's deposition. Fesler testified that
a company man is present to see that everything is done according to standards for running casing
and, while the crew is on day-work, to see that everything is done according to "specs." Fesler also
testified that the company man is "the one that went out there and made sure that the casing was
right, everything went right, everything was in place, and everything was run at the right place 
. . . ." Fesler testified that, when the crew started pulling the casing out, he told a couple of hands
who were standing close to the cellar to "come over there out of the way" because "you don't stand
under that V-door when they're laying pipe down." Fesler then walked to the toolpusher's truck at
the edge of the site and asked the toolpusher whether he had released the rotating head.

1. Applicability of Chapter 95


 In their first issue, Appellants argue that chapter 95 of the Civil Practice and Remedies Code
does not apply to Momentum or Xact, because claims arising from a drilling operation are not claims
arising from the use and condition of an improvement to real property. Section 95.002 of the Code
provides that the chapter applies only to a claim (1) against a property owner, contractor, or
subcontractor for personal injury, death, or property damage to an owner, contractor, or subcontractor
(2) that arises from the condition or use of an improvement to real property, where the contractor or
subcontractor constructs, repairs, renovates, or modifies the improvement. Tex. Civ. Prac. & Rem.
Code Ann. § 95.002. Section 95.001 defines a "property owner" as "a person or entity that owns
real property primarily used for commercial or business purposes." Tex. Civ. Prac. & Rem. Code
Ann. § 95.001. By virtue of its ownership of the mineral interests relevant to the Lindsey No. 1
Well, Momentum is a property owner as defined by section 95.001. See Chi Energy, Inc. v. Urias,
156 S.W.3d 873, 879 (Tex. App.--El Paso 2005, pet. denied) (chapter 95 held applicable to the
owner of the leasehold interest in an oil well); Francis v. Coastal Oil & Gas Corp., 130 S.W.3d 76,
84 (Tex. App.--Houston [1st Dist.] 2003, no pet.) (oil and gas lessee who used the subject property
for the commercial and business purposes of producing and marketing oil and gas held a property
owner under chapter 95).

 Appellants argue that their negligence claims involve the rotating head that was attached to
Robinson's drilling rig and that neither the head nor the rig was an improvement to real property. 
However, chapter 95 applies to a claim for personal injury "that arises from the condition or use of
an improvement to real property where the contractor or subcontractor constructs, repairs, renovates,
or modifies the improvement." Tex. Civ. Prac. & Rem. Code Ann. § 95.002(2). Courts have held
that chapter 95 applies, despite the fact that the object causing the injury is not itself an
improvement, where the injury arises from work being done on an improvement. Fisher v. Lee &
Chang P'ship, 16 S.W.3d 198, 200-02 (Tex. App.--Houston [1st Dist.] 2000, pet. denied); Spears
v. Crown Central Petroleum Corp., 133 Fed. Appx. 129, 131 (5th Cir. 2005) (affirming summary
judgment for defendant in case where plaintiff was injured after tripping on hoses while on premises
to perform maintenance on a heat exchanger); Admire v. H.E. Butt Grocery Co., No. 01-02-00060-CV, 2003 WL 203514, at *2 (Tex. App.--Houston [1st Dist.] January 30, 2003, no pet.) (injuries
resulting from fall from ladder leading to roof of building where contractor was repairing
refrigeration units arose from use of an improvement to the property under section 95.003); Moreno
v. BP Am. Prod. Co., No. 04-08-00036-CV, 2008 WL 4172248, at *2 (Tex. App.--San Antonio Sept.
10, 2008, no pet. h.) (chapter 95 applied to injuries suffered by contractor's employee while
unloading pipe at well site).

 Appellants also argue that the drilling work performed by Robinson did not constitute the
construction of an improvement to real property under section 95.002(2). Appellants rely on Holley
v. NL Indus./NL Acme Tool Co., 718 S.W.2d 813, 814-15 (Tex. App.--Austin 1986, writ ref'd n.r.e.). 
In that case, the Austin Court of Appeals stated that "[t]he drilling of an oil well does not involve
construction, in the sense of assembling materials to make a permanent whole. The drilling rig,
itself, is not a permanent fixture, but rather is removed from the well-site after drilling is completed." 
Id. at 815. The issue in Holley was whether a contract for the drilling of an oil well was a
construction contract, as defined by section 162.001(a) of the Texas Property Code, such that a
contractor that furnished materials for the drilling operation would be entitled to construction
contract trust funds. (5) Id. at 813-14. The Holley court concluded that the drilling of an oil well did
not constitute an improvement, because the drilling rig itself was not a permanent fixture and
because "[d]rilling a hole in the ground does not involve the assembly of various materials into a
permanent structure." Id. at 815. The court noted further that casing pipe involved permanent
construction, but the court reasoned that it was placed in the hole simply to preserve the hole and
prevent it from collapsing.

 Appellees point to Francis, where the employee of an independent contractor brought an
action against the operator of an oil well for injuries sustained during an explosion. The employee,
relying on Holley, argued that chapter 95 did not apply to his negligence claim, because, as a matter
of law, an oil well is not an improvement to real property. 130 S.W.3d at 84-85. The Francis court
noted that "Holley focuses solely on whether 'construction,' specifically the activity of drilling,
constitutes an improvement under the construction-payments provisions of the Property Code." Id.
at 85. The court also distinguished Holley on the ground that it dealt with drilling, "in contrast to
the well that remains after the drilling." Id.

 Momentum also relies on Credeur v. MJ Oil Inc., 123 Fed. Appx. 585, 2004 WL 2914039
(5th Cir. Dec. 15, 2004) (not designated for publication). In Credeur, an employee of a contractor
hired to perform various services in support of drilling an oil well, including mud filtration, was
injured when he partially fell through a hatch accessing the mud tank. Id. at 587, 2004 WL 2914039,
at *1. The district court granted summary judgment in favor of the operator, on the grounds that
chapter 95 provided the employee's exclusive remedy and that he did not establish liability under
the statute. Id. On appeal, the employee argued that chapter 95 did not apply to his work on the rig,
because it was not construction, repair, renovation, or modification of an improvement. Id. at 588,
2004 WL 2914039, *2. The Fifth Circuit disagreed, and, relying on Francis, concluded that activity
facilitating a well's performance was construction, renovation, or modification. Id.

 "There can be no improvement without annexation to realty, and until personalty is annexed
to realty, it by definition cannot be an improvement." Sonnier v. Chisholm-Ryder Co., 909 S.W.2d
475, 479 (Tex. 1995). Whether personalty has become affixed to realty, such that it constitutes an
improvement, depends upon: (1) the mode and sufficiency of annexation; (2) the adaptation of the
personalty to the use or purpose of realty; and (3) the intention of the owner. Id. The third factor
is preeminent, and the first two factors are considered evidence of intent. Id. "The class of
improvements is considered to be broader than that of fixtures, which are items of personalty that
have become permanent parts of the realty to which they are affixed." Reames v. Hawthorne-Seving,
Inc., 949 S.W.2d 758, 761 (Tex. App.--Dallas 1997, pet. denied) (holding that conveyor belt with
wheels was constructively annexed to property).

 There is no evidence in this case that speaks to Momentum's intent with regard to the well. 
In its reply brief and at oral argument, Appellants argued that drilling a well was not an
improvement, because there was no annexation of personalty to realty. Appellants submitted
summary judgment evidence in the form of Xact's invoices to Momentum. The invoices show
charges for cementing the casing into the well, and it is undisputed that this occurred. There was
thus an attachment of personalty to realty.

 Appellants do not dispute that a completed well is an improvement. Instead, they seek to
distinguish the act of drilling a well from the construction of a well structure, once drilling is
complete. What Appellants have not explained, however, is how a well may be constructed without
drilling. It is axiomatic that the drilling and the installation of casing is an integral part of the
construction of a well and that, without drilling, there can be no well. Drilling and the completion
of drilling operations are more properly characterized as an essential part of the construction of a
well, as opposed to some preliminary, unrelated task. We conclude that, in the context of section
95.002, Appellants were involved in the construction of an improvement to real property. See
Moreno, 2008 WL 4172248, at *2 (chapter 95 applied to injuries suffered by contractor's employee,
where contractor was hired to drill and set conductor pipe at a well site).

2. Actual Knowledge of the Danger or Condition


 In order for liability to be imposed, section 95.003 requires that a plaintiff show that the
property owner "exercises or retains some control over the manner in which the work is performed,
other than the right to order the work to start or stop or to inspect progress or receive reports." Tex.
Civ. Prac. & Rem. Code Ann. § 95.003(1). In addition, a plaintiff must show that "the property
owner had actual knowledge of the danger or condition resulting in the personal injury, death, or
property damage and failed to adequately warn." Id. § 95.003(2); see also Ellwood Tex. Forge Corp.
v. Jones, 214 S.W.3d 693, 700 (Tex. App.--Houston [14th Dist.] 2007, pet. denied) (chapter 95
requires that a plaintiff show both control and actual knowledge of the danger in order to prevail).

 With regard to actual knowledge of the danger or condition, Appellants first argue that
neither Xact nor Momentum provided Fesler with a safety manual or training for his services as a
company man at the well site. Even if we assume that this is relevant to Momentum's actual
knowledge, we note that the deposition testimony referenced shows merely that Xact did not train
people to be company men, because it hired persons with several years of experience in the field after
conducting interviews to determine this. Xact did, however, require safety training once every
month or two, which Fesler apparently attended. Appellants also argue that, prior to the accident,
Fesler directed Robinson crew members to move away from a certain area at the well site, because
of the danger of getting hit by something during disassembly of the drilling rig.

 In his summary judgment response, Painter relied on various portions of Fesler's deposition
testimony, including the following:

 They started pulling the casing out. And there was a couple of hands that was
standing over close to the cellar then. And I told them to come over there out of the
way. And then I walked off to the company man's pickup while they were laying the
pipe down because you don't stand under that V-door when they're laying pipe down. 


. . .



 Q: Where was the BOP at whenever they were lifting the casing and you told--


 A: It was still hung on the blocks.


 Q: Okay. And then you told some--you told two of them to watch out for the pipe?


 A: Yeah. I told them to watch out for the pipe, because you go to laying stuff down,
you don't stand under there where something can hit you. 


 Appellants argue that Fesler's testimony establishes his knowledge of the danger of being
hit by something falling during dismantling of the drilling rig. They contend that, although Fesler
may not have had knowledge of the dangerous condition of the rotating head (because of its being
secured by only two bolts), he had knowledge of the danger of its falling from above.

 Appellants concede that their summary judgment evidence fails to show that Fesler had any
knowledge that the rotating head was only secured by two bolts. The evidence shows only that
Fesler was aware of the danger of being hit by casing or pipe when it is being removed and laid
down, not of the danger of being hit by the rotating head. Moreover, it is undisputed that Fesler
walked away from the well site at the time that the Robinson employees attempted to remove the
blowout preventer and rotating head. The danger or condition that resulted in the accident was the
fact that the rotating head was secured with only two hand-tightened bolts. Fesler's knowledge of
the possibility of being hit by pipe or casing as it is being laid down is not sufficient to satisfy the
requirement that a property owner have actual knowledge of the danger or condition that caused the
injury.

 Pursuant to chapter 95, a property owner owes a duty to warn only of known dangers. Fisher,
16 S.W.3d at 202 (landowner who did not have knowledge of defective ladder had no duty to warn);
see also Rueda v. Paschal, 178 S.W.3d 107, 109-10 (Tex. App.--Houston [1st Dist.] 2005, no pet.)
(affirming summary judgment in favor of property owner where the plaintiff produced no evidence 
that property owner was aware of alleged defect in ladder); Kelly v. LIN Television of Texas, L.P.,
27 S.W.3d 564, 572 (Tex. App.--Eastland 2000, pet. denied) (negligence in failing to inspect tower
for stress fractures not equivalent to actual knowledge under chapter 95); James v. Cousins Props.
Tex., L.P., No. 03-06-00617-CV, 2008 WL 2220016 (Tex. App.--Austin May 30, 2008, no pet.)
(mem. op.) (requisite knowledge pursuant to chapter 95 was not knowledge of the danger in placing
portable toilet on sidewalk, but rather knowledge that toilet had been placed on sidewalk with wheels
unlocked); Bishop v. Nabisco, Inc., No. 14-03-00639-CV, 2004 WL 832916, at *3 (Tex. App.--Houston [14th Dist.] Apr. 20, 2004, no pet.) (knowledge that object that caused injury could be
potentially harmful if working with large equipment nearby was not equivalent to actual knowledge
that object itself was dangerous).

 We overrule this issue. Because we have determined that there was no evidence of actual
knowledge, we do not address the issue of control, as it relates to Momentum.

3. Contractual Liability

 The trial court's summary judgment provided that Appellants take nothing by their claims
against Momentum, Xact, and McGuire. Appellants argue that chapter 95 does not apply to the
contractual claims that they asserted against Momentum. They further argue that, under the terms
of the Drilling Contract, Momentum assumed liability for the accident. In this regard, Appellants
rely on a provision contained in the introductory paragraph of the Drilling Contract, a portion of
which provides, "[e]xcept for such obligations and liabilities specifically assumed by Contractor,
Operator shall be solely responsible and assumes liability for all consequences of operations by both
parties while on a Daywork Basis, including results and all other risks or liabilities incurred in or
incident to such operations." In addition, Appellants rely on section 19.9(b) of the Drilling Contract,
which provides that "Contractor will preassemble, disassemble, or assemble materials to be
furnished by Operator only when directed by Operator and when such work can be accomplished by
normal rig personnel. All of such services shall be performed on a Daywork Basis, Operator shall
release Contractor from, and shall protect, defend and indemnify Contractor from and against any
liability for such service." Appellants argue that they were working on a daywork basis at the time
of the injury and that, as a consequence, Momentum is contractually liable for the death and injuries
that resulted from the accident.

 We need not reach the issue of whether chapter 95 applies to Appellants' purported contract
claims, for the simple reason that Appellants did not assert a contract claim against Momentum. 
Appellants argue that they plead a breach of contract claim. The petitions, which are substantially
similar with regard to Painter and Perkins, contain one section detailing the claims against
Momentum, Xact, and McGuire. The heading for this section is entitled "Plaintiff's Claims of
Negligence and Products Liability Claims." The opening sentence of this section in Painter's
petition reads, "[t]his lawsuit is brought because of the horrific injuries received by Plaintiff Dusty
Painter because of the negligence of Defendants." Similarly, the opening sentence in Perkins'
petition reads, "[t]his lawsuit is brought because of the horrific injuries and death of Jesse Perkins
because of the negligence of Defendants . . . ." Both petitions then proceeded to allege facts relating
to the accident, asserting that Momentum and Xact had a duty to supervise the drilling operation in
one paragraph, and Perkins (but not Painter) alleged that Fesler maintained actual control and
direction over the dismantling of the rig in the next paragraph. In the following paragraph, both
Painter and Perkins allege that Momentum and Xact "were further contractually liable for the safety
of the drilling operation in question at the time of the injuries alleged herein. Defendants were
exercising actual control over the drilling operation at the time of the accident in question." In her
prayer, Tina Perkins, requested wrongful death damages, mental anguish damages, and medical and
counseling expenses. In his prayer, Painter sought damages for medical bills, lost wages and earning
capacity, pain and mental anguish, loss of consortium, and exemplary damages.

 The Rules of Civil Procedure require that a petition set forth "a short statement of the cause
of action sufficient to give fair notice of the claim involved." Tex. R. Civ. P. 47(a). A fair reading
of Appellants' live petitions does not reveal the pleading of a contract claim. The statement that
Momentum and Xact were "contractually liable for the safety of the drilling operation" was alleged
among various other allegations concerning Momentum and Xact's duty to supervise and control the
drilling operation. The following sentence alleges that Momentum and Xact had "actual control"
over the drilling operation. As previously noted, all of these allegations were pled under the heading
that denoted negligence and product liability claims. In addition, neither Appellant sought any
damages that would indicate a contract claim. While this certainly provides notice as to Appellants'
allegations concerning Momentum's assertion of contractual and actual control over the operation
for the purposes of a negligence claim, they do not provide notice of a contract claim against
Momentum. See Eikon King St. Manager, L.L.C. v. LSF King St. Manager, L.L.C., 109 S.W.3d 762,
771 (Tex. App.--Dallas 2003, pet. denied) (passing reference to a covenant of good faith in single
sentence under section of pleading labeled "breach of contract," was not sufficient to put opposing
party on fair notice of claim for breach of the duty of good faith and fair dealing). We overrule this
issue.

C. Xact's Traditional and No Evidence Motion for Summary Judgment


 Xact filed a motion for summary judgment, in which it asserted both traditional and no-evidence grounds. Xact argued, inter alia, that there was no evidence that it asserted control over
Robinson sufficient to assert liability over it on negligence grounds. As for its traditional motion
for summary judgment, Xact argued that it was an agent of Momentum and was thus entitled to the
protections of chapter 95. As evidence, Xact attached the same affidavits of Louie Michael Cure and
Melvin Fesler that were attached to Momentum's motion for summary judgment, which are
discussed above.

 Xact also attached excerpts from the deposition of Robert Robinson, the president of GR
Robinson Management, L.C., the managing general partner of Robinson Drilling of Texas, Ltd.,
which had contracted with Momentum to perform the drilling operations at the well. Mr. Robinson
testified that Robinson Drilling had no contract with Xact. Mr. Robinson also testified that he did
not expect any of Xact's employees or consultants, including Fesler, to train or supervise his
company's employees. Mr. Robinson further testified that he did not expect Xact to have any role
in laying the blowout preventer down on the date of the accident.

 Xact attached the deposition of Henry Renbarger, an employee of Robinson. Renbarger
instructed Tony Painter, (6) the driller, to lay down the blowout preventer. Renbarger testified that
Tony Painter's role with regard to laying down the blowout preventer was to supervise the crew.

 Appellant Painter argued in response that, pursuant to the terms of the contract between
Momentum and Robinson, Momentum exerted control of daywork operations, and that Xact was
liable by virtue of having undertaken Momentum's obligations under the contract. Painter also
argued that Xact, through Fesler, exerted actual control over Robinson's drilling operations,
including the laying down of the blowout preventer. Finally, Painter argued that Xact had actual
knowledge of the danger and failed to warn him.

1. Applicability of Chapter 95


 On appeal, Painter argues that chapter 95 is not applicable to Xact, because Xact is not a
property owner. As noted above, the chapter defines a "property owner" as "a person or entity that
owns real property primarily used for commercial or business purposes." Tex. Civ. Prac. & Rem.
Code Ann. § 95.001(3). Section 95.002 deals with the applicability of the chapter and provides that
it applies to a claim "against a property owner, contractor, or subcontractor for personal injury, death,
or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or
subcontractor . . . ." Tex. Civ. Prac. & Rem. Code Ann. § 95.002(1). However, section 95.003,
which deals with exemption from liability for acts of independent contractors, only refers to a
property owner, and not to contractors, subcontractors, or any other persons or entities. See Tex.
Civ. Prac. & Rem. Code Ann. § 95.003.

 Xact nevertheless contends that section 95.003 also applies to a subcontractor. Xact relies
on Fisher v. Lee & Chang P'ship. In Fisher, the employee of an independent contractor hired to
make repairs at a retail store fell from a ladder and subsequently brought suit against the property
owner and the property managers. 16 S.W.3d at 200. The First Court of Appeals held that chapter
95 applied to the claim against the property managers. Id. at 203. The court explained that the
plaintiff alleged that the property managers were "agents, representatives, or employees" of the
owner. Id. The court concluded that "sec. 95.003 applies to property owners and also to their agents
who oversee their properties." Id.; see also Padron v. L & M Props., No. 11-02-00151-CV, 2003
WL 253927, at *3 (Tex. App.--Eastland Feb. 6, 2003, no pet.) (applying chapter 95 to property
management company); Nagle v. GOM Shelf, L.L.C., No. Civ. A. V-03-103, 2005 WL 1515439, at
*4 (S.D. Tex. June 24, 2005) (holding that manager who was agent of owner was entitled to
protections of chapter 95).

 The Master Service Agreement between Momentum and Xact provides in pertinent part:

 WHEREAS, in the absence of the execution of a formal written contract for each
project, the parties hereto desire to agree upon and enter into a contract which will
set forth the terms and conditions under which all work will be performed by
Contractor for Company and which will be applicable to all projects irrespective of
the formality or informality which Contractor is retained.


. . .


 Independent Contractor. Nothing contained in this Agreement shall be construed to
constitute Contractor . . . as a partner, employee, agent or "borrowed servant" of the
Company . . . nor shall either party have any authority to bind the other in any
respect.


 "A question of agency is generally one of fact, and one may be an independent contractor
under some circumstances yet may be an agent or employee in connection with other work or
activities." Lyons v. Lindsey Morden Claims Mgmt., Inc., 985 S.W.2d 86, 90 (Tex. App.--El Paso
1998, no pet.); see also Coleman v. Klöckner & Co. AG, 180 S.W.3d 577, 587 (Tex. App.--Houston
[14th Dist.] 2005, no pet.) ("[t]he question of whether an agency relationship exists is generally a
question of fact"). Although the Master Services Agreement does not necessarily preclude the
existence of an agency relationship at some point during the drilling operation, Xact has not shown
that there is no fact issue on this question. Nor does Xact cite any authority extending the
protections of chapter 95 to an independent contractor. See Arsement v. Spinnaker Exploration Co.,
400 F.3d 238, 251 (5th Cir. 2005) (stating that chapter 95 applies to the property owner, but not to
general or independent contractors). Chapter 95 does not, in our opinion, apply to the negligence
claims against Xact.

2. Xact's Right of Control


 In support of his argument concerning contractual control, Painter points to the following
provisions of the contract between Momentum and Robinson:

 Notwithstanding that this is a Footage Basis contract, Contractor and
Operator recognize that certain portions of the operations as hereinafter designated,
both above and below Contract Footage Depth, will be performed on a Daywork
Basis. For purposes hereof, the term "Daywork" or "Daywork Basis" means
Contractor shall furnish equipment, labor, and perform services as herein provided,
for a specified sum per day under the direction, supervision and control of Operator
(inclusive of any employee, agent, consultant or subcontractor engaged by Operator
to direct drilling operations). When operating on a Daywork Basis, Contractor shall
be fully paid at the applicable rates of payment and assumes only the obligations and
liabilities stated herein as being applicable during Daywork operations. Except for
such obligations and liabilities specifically assumed by Contractor, Operator shall be
solely responsible and assumes liability for all consequences of operations by both
parties while on a Daywork Basis, including results and all other risks or liabilities
incurred in or incident to such operations.


 Contractor will preassemble, disassemble, or assemble materials to be furnished by
Operator only when directed by Operator and when such work can be accomplished
by normal rig personnel. All of such services shall be performed on a Daywork
Basis. Operator shall release Contractor from, and shall protect, defend and
indemnify Contractor from and against any liability for such service.


 Painter argued in his response and on appeal that the foregoing provisions vested Momentum
and Xact, as its representative, with the right to control the details of the work done by Robinson. 
However, section 20.1 of the Drilling Contract provides:

 In the performance of the work herein contemplated, Contractor is an Independent
Contractor, with the authority to control and direct the performance of the details of
the work, Operator being only interested in the results obtained. The work shall meet
the approval of Operator and be subject to the right of inspection and supervision
herein provided. Operator shall not unreasonably withhold approval of all such
work, when performed by Contractor in accordance with the generally accepted
practices and methods customary in the Industry. Contractor agrees to comply with
all laws, rules, and regulations, Federal, State, and Local, which are now, or may in
the future become applicable to Contractor, Contractor's business, equipment, and
personnel engaged in operations covered by this Contract or accruing out of the
performance of such operations; provided, however, as between Operator and
Contractor specific provisions herein contained respecting the risk and responsibility
for such compliance shall be controlling. 


 Xact argues that, while it was engaged by Momentum to monitor certain aspects of the
drilling and casing of the well, there was no evidence that Momentum engaged Xact to control the
operative details of the dismantling of the drilling rig or that Xact substituted its performance for that
of Momentum. Xact further argues that the Contract itself only gives Momentum broad, supervisory
powers over the daywork operations, not the right to control the operative details of such work. (7)

 The duty to keep the premises in a safe condition may impose liability on a general contractor 
for negligence in two circumstances: (1) those arising from a premises defect and (2) those arising
from an activity or instrumentality. Redinger v. Living, Inc., 689 S.W.2d 415, 417 (Tex. 1985). This
is a negligent activity case. See Coastal Marine Serv., Inc. v. Lawrence, 988 S.W.2d 223, 225-26
(Tex. 1999). A general contractor ordinarily does not owe a duty to ensure that an independent
contractor performs its work in a safe manner. Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778,
783 (Tex. 2001); Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999). However, a duty may
arise if the general contractor "retains some control over the manner in which the independent
contractor performs its work." Harrison, 70 S.W.3d at 783.

 Texas has adopted section 414 of the Restatement (Second) of Torts. See Redinger, 689
S.W.2d at 418; Koch Refining Co. v. Chapa, 11 S.W.3d 153, 155 (Tex. 1999). Section 414 provides:

 One who entrusts work to an independent contractor, but who retains the
control of any part of the work, is subject to liability for physical harm to others for
whose safety the employer owes a duty to exercise reasonable care, which is caused
by his failure to exercise his control with reasonable care.


Restatement (Second) of Torts § 414 (1977). The comments to section 414 explain that:

 In order for the rule stated in this Section to apply, the employer must have retained
at least some degree of control over the manner in which the work is done. It is not
enough that he has merely a general right to order the work stopped or resumed, to
inspect its progress or to receive reports, to make suggestions or recommendations
which need not necessarily be followed, or to prescribe alterations and deviations.
Such a general right is usually reserved to employers, but it does not mean that the
contractor is controlled as to his methods of work, or as to operative detail. There
must be such a retention of a right of supervision that the contractor is not entirely
free to do the work in his own way.


Id. at § 414 cmt. c; see also Chi Energy, 156 S.W.3d at 880 (degree of control retained must be more
than a general right to order the work stopped or resumed, inspect its progress or to receive reports,
make suggestions or recommendations which need not necessarily be followed, or prescribe
alterations and deviations); Bell v. VPSI, Inc., 205 S.W.3d 706, 719 (Tex. App.--Fort Worth 2006,
no pet.) ("The retained right of control must extend to the operative details of the contractor's work
so that he is not free to do the work in his own way."); Perez v. Embree Constr. Group, Inc., 228
S.W.3d 875, 881 (Tex. App.--Austin 2007, pet. denied) ("a limited duty arises if a general contractor
retains control over a subcontractor's methods of work or operative details, so that the subcontractor
is not entirely free to do the work in his own way").

 No evidence was produced as to any contract between Momentum and Xact that provided
Xact with control over the operative details of Robinson's work at the well site. The Master Service
Agreement contains no such provision, and there was no contract between Xact and Robinson.

 Painter relies exclusively on the Drilling Contract between Momentum and Robinson. He
argues that section 20.1 of the Drilling Contract applies only to work done on a footage basis, and
not to work done on a daywork basis. However, section 20.1 applies to "the work herein
contemplated" and is not, by its terms, limited to footage work. We conclude that, even assuming
the Drilling Contract could be applied to Xact, a non-party, the Drilling Contract did not vest Xact
with the right to control the operative details of Robinson's disassembly of the rig.

 Painter also argues that Xact retained actual control over the drilling operations. Painter
points to his summary judgment evidence concerning Xact's billing records and deposition testimony
concerning Fesler's role as a company man. The billing records indicate that Xact charged
Momentum for "Professional Consulting Services for Momentum Energy Corp. Wellsite Supervision
undertaken on the Lindsey No. 1 well, Upton Co., Texas. By: Melvin Fesler." The invoices show
that Xact charged Momentum for getting the casing ready, running casing, and cementing the casing. 
 Painter also submitted deposition testimony concerning Fesler's role at the well site. Fesler
testified that "[a] company man is sent out there to see that everything is done according to the API
standards for running casing . . . . While they're on day-work, they are out there to see that
everything is done according to their specs." Fesler further testified that the company man is "the
one that went out there and made sure that the casing was right, everything went right, everything
was in place, and everything was run at the right place and everything, and everything was done
right." In his deposition, Robert Robinson agreed when asked that the company man had the
ultimate say-so about the operation. Robinson also agreed that the company man had the right and
responsibility to dictate the manner and means of the completion procedures with regard to the rig. 
Henry Renbarger, a Robinson employee, agreed when asked at his deposition whether the company
man was the "captain of that team." Finally, Appellants point to the deposition testimony, discussed
above, that, prior to the accident, Fesler directed Robinson crew members to stand out of the way
while the crew was removing and laying down casing. However, none of the foregoing testimony
indicates that Fesler gave Robinson any instruction over the operative details of laying down of the
blowout preventer and the rotating head. In fact, it is undisputed that Fesler had walked away from
the rig prior to the time of the accident. Accordingly, we conclude that no evidence was produced
to show that Xact exercised actual control over Robinson with regard to the activity that resulted in
the accident. We overrule this issue.

D. McGuire Industries' Motions for Summary Judgment


 Painter asserted negligence and strict liability claims against McGuire. He alleged that
McGuire failed to provide any warning or instruction on how to connect and remove the rotating
head. Painter also alleged that McGuire designed and manufactured the rotating head without
adequate safety devices in the form of a safety chain or other catch device to prevent the rotating
head from falling. In addition, he asserted claims for breach of implied warranties of merchantability
and fitness for a particular purpose. Painter appeals only the trial court's summary judgment
regarding his negligence and strict liability claims as they relate to McGuire's alleged failure to
warn. (8)

 McGuire brought both a traditional and a no-evidence motion for summary judgment. In its
no-evidence motion, McGuire argued that it was not negligent, because there was no evidence that
McGuire owed a duty to provide warnings or instructions with the rotating head concerning the
number of bolts to be used during disassembly or any preferred procedure for laying down the
blowout preventer stack. With regard to Painter's strict liability claim, McGuire argued that there
was no evidence of a marketing defect, because it had no duty to warn of an open and obvious danger
and there was no evidence that any warnings concerning removal of the rotating head were
necessary.

1. McGuire's Summary Judgment Evidence


 In its traditional motion for summary judgment, McGuire argued that it was entitled to
summary judgment on Painter's strict-liability marketing claim, because the removal of the rotating
head by tipping it over with only two bolts attached was an open and obvious danger. Similarly,
McGuire argued that it was entitled to judgment on Painter's negligence claim, because it had no
duty to warn or provide instructions as to obvious risks. As evidence, McGuire attached the
deposition testimony of various employees of Robinson, including Painter, who testified that, as part
of his duties, he had previously been engaged in hooking up or taking apart the rotating head. 
Painter also testified as follows:

 Q: Okay. Sitting here--and I think you said before, sitting here today you were
unaware that there was ever any discussions at all about bolts being removed in any
way, correct?


 A: Yes, sir.


 Q: Okay. Had anybody ever told you that any of those bolts had simply been backed
out? In other words, not completely removed but perhaps removed most of the way
or partially and then maybe made hand tight?


 A: No, sir.


 Q: If the bolts securing the rotating head to the BOP were just hand tight, that
wouldn't be right, correct?


 MR. KERBY: Objection, form.


 A: Correct.


 Q: (BY MR. ECHOLS) That would be an incorrect procedure?


 A: Yes, sir. 


 McGuire also attached the deposition testimony of Tony Painter, the driller on Appellant
Painter's shift. Mr. Painter testified that he was only able to use four to six holes in the blowout
preventer to which he was to attach the rotating head, because the threads were "messed up" or full
of cement. He further testified that he had additional bolts, but was unable to use them, because he
"didn't have the holes" in the blowout preventer to screw them down. Mr. Painter testified that he
had reported the problem, but Robinson had taken no action to his knowledge. He testified that he
had been told that there were two bolts remaining in the rotating head before the accident. Mr.
Painter further testified that he had laid a blowout preventer and rotating head over with only two
bolts in the past. He agreed that having as many bolts in as possible would be a safer procedure, but
testified that "it would have took me that much longer when I got it laying down to take them bolts
out."

 McGuire also attached portions of the deposition of Renbarger, an employee of Robinson,
who worked as a toolpusher during the time of the accident. Renbarger testified that the method
used to lay down the blowout preventer stack the day of the accident was a common occurrence on
an oil well. Renbarger also testified as follows:

 Q: Is the reason that you would have frowned upon that and the reason that you
believe that would be stupid is because it's common sense that the more bolts you
have in place securing the rotating head to the BOP, the safer it is to lay down the
BOP stack?


 MR. THOMPSON: Form.


 A: Well, yes. Just like it's common sense that you don't want to take them out
because it will fall off.


 MR. THOMPSON: Nonresponsive.


 Q: In other words, the best practice and the practice that you all followed was to
make sure that there were sufficient bolts securing the rotating head to the BOP so
that it would not fall off?


 A: Yes, sir.


 MR. THOMPSON: Form.


 Q: And it is--again, it's common sense that the more you have, the better, right?


 MR. THOMPSON: Form.


 A: Yes, sir. 


Renbarger also testified that he did not need any warnings, that he did not expect that Tony Painter
would have needed any warnings to know that there needed to be more studs securing the rotating
head before the BOP stack was laid over, and that he knew this at the time. 

 McGuire attached excerpts from the deposition of William Ryan Locke, a Robinson
employee, who was on the shift immediately prior to Painter's. Locke testified that he instructed his
crew to remove two bolts of the four bolts securing the rotating head to the blowout preventer,
because he was told to do so. Locke made sure that he could turn them by hand. Locke also
testified:

 Q: All right. Do you know whether or not there was any safer or preferred method
of laying down--


 A: Yes, should have taken the rotating head off.


 MR. THOMPSON: Form.




. . .


 Q: All right. At what point in time did you come up, then, with your understanding
that it's more appropriate to take the rotating head off first?


 MR. THOMPSON: Form.


 A: I think the first time I ever did it and then when the accident happened. 


 Also attached to McGuire's motion were excerpts from the deposition of Daniel Nunn, a
Robinson employee at the time of the accident. Nunn testified that Locke told him to remove two
of the four bolts securing the rotating head and to leave the remaining bolts hand- tightened. Nunn
told Locke that he would have taken the whole thing off. Nunn further testified:

 Q: What exactly did you tell Mr. Locke?


 A: I told him, "This is bullshit."


 Q: Okay.


 A. "I wouldn't do it like that."


 Q: Okay. When you say, "This is bullshit," did you tell him what was bullshit?


 A: Yeah.


 Q: Tell me as best you can remember the exact words you used when you told him.


 A: I can't remember that great.


 Q: Okay. Well, tell me best you can remember. What did you tell him?


 A: Just told him that we shouldn't do it that way.


 Q: Shouldn't do what--


 A: It should be taken off and sat on the ground before you ever lay your stack over. 


 McGuire attached the deposition of Robert Robinson, who testified that his company's verbal
procedure with respect to a blowout preventer and a rotating head was to "unbolt it and take it off
and lay it on the ground." Mr. Robinson also testified as follows:

 Q: Would there be any reason to take out all but two of the bolts on a rotating head
and then begin to lay it down?


 MR. THOMPSON: Form.


 A: No, I don't see why.


 Q: Did y'all have any procedure in place where that would have been an appropriate
action, take all but two bolts out and then begin to lay the vertical assembly down?


 MR. THOMPSON: Form.


 A: No.


2. Painter's Summary Judgment Evidence


 In his summary-judgment response, Painter argued that the danger relating to the rotating
head was not open and obvious, because Robinson had used the method of tipping over the blowout
preventer and rotating head whenever it removed a rotating head and that McGuire failed to warn
or instruct as to the proper procedure to remove the rotating head, which, according to Weldon
McGuire, was to remove the rotating head from the blowout preventer stack while the blowout
preventer was upright.

 Painter attached portions of the deposition of Weldon McGuire. Mr. McGuire stated that the
portion of the rotating head that fell during the accident weighed approximately 1,500 pounds. 
McGuire did not provide any instructions or warnings with the rotating head, nor did McGuire rent
bolts to Momentum for the rotating head. Mr. McGuire also testified that, when his company rents
out a complete blowout stack, including the rotating head, its normal procedure was to have a man
on location at the rate of $55 per hour to see that the stack is put together properly. However,
Mcguire does not provide someone to supervise assembly when only a rotating head is rented. 
McGuire sends a company representative to supervise disassembly of a complete stack when
requested. Mr. McGuire also testified that, when the rotating head is removed from the blowout
preventer, it is usually unbolted, lifted off, and set on the ground and that this was necessary to
disassemble the head safely. When assembling the blowout preventer, McGuire's supervisor is
instructed to use all twenty bolts when attaching the rotating head to the blowout preventer.

 Painter also attached portions of the deposition of Henry Renbarger. Renbarger did not recall
any instructions or warnings concerning how many bolts should be attached to the rotating head. 
Renbarger also testified that, if McGuire had provided a warning as to the number of bolts to use in
attaching the rotating head, he would have followed it. Painter also pointed to deposition testimony
by Tony Painter and William Locke indicating that the method used the day of the accident to
disassemble the blowout preventer stack was the method that Robinson used to remove the stack.


3. Painter's Strict Liability Claim


 On appeal, Painter argues that its summary judgment evidence and the reasonable inferences
therefrom showed that McGuire was aware of the risk of harm from improperly assembling and
disassembling the rotating head and that McGuire failed to give proper warnings or instructions
concerning assembly and disassembly.

 Texas has adopted the theory of strict products liability expressed in section 402A of the
Restatement (Second) of Torts. Caterpillar, Inc. v. Shears, 911 S.W.2d 379, 381 (Tex. 1995) (citing
McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 788-89 (Tex. 1967)). "A defendant's failure to
warn of a product's potential dangers when warnings are required is a type of marketing defect." 
American Tobacco Co. v. Grinnell, 951 S.W.2d 420, 426 (Tex. 1997). The elements of a marketing
defect claim are: (1) a risk of harm that is inherent in the product or that may arise from the intended
or reasonably anticipated use of the product; (2) the supplier of the product knows or reasonably
should foresee the risk of harm at the time the product is marketed; (3) the product has a marketing
defect; (4) the lack of warnings or instructions renders the product unreasonably dangerous to the
ultimate user or consumer; and (5) the failure to warn or instruct causes the user's injury. Ranger
Conveying & Supply Co. v. Davis, 254 S.W.3d 471, 480 (Tex. App.--Houston [1st Dist.] 2007, pet.
denied); Goodyear Tire & Rubber Co. v. Rios, 143 S.W.3d 107, 116 (Tex. App.--San Antonio 2004,
pet. denied).

 There is, however, no duty to warn when a product's risks are within the ordinary common
knowledge of the community. Joseph E. Seagram & Sons, Inc. v. McGuire, 814 S.W.2d 385, 388
(Tex. 1991). In addition, the law of products liability does not require a manufacturer or distributor
to warn of obvious risks. Caterpillar, 911 S.W.2d at 382; see also Grinnell, 951 S.W.2d at 426;
Lozano v. H.D. Indus., Inc., 953 S.W.2d 304, 314 (Tex. App.--El Paso 1997, no pet.) ("A party has
no duty to warn of obvious risks, since a readily apparent danger serves the same function as a
warning."); Hanus v. Texas Utils. Co., 71 S.W.3d 874, 880 (Tex. App.--Fort Worth 2002, no pet.)
("a manufacturer has no duty to warn of obvious risks because a readily apparent danger serves the
same function as a warning"); Roland v. DaimlerChrysler Corp., 33 S.W.3d 468, 469 (Tex. App.--Austin 2000, pet. denied) ("In Texas, a manufacturer has no duty to warn of open and obvious
dangers."). Thus, there is only a duty to warn or instruct concerning risks of which the consumer is
unaware. Caterpillar, 911 S.W.2d at 382. "The consumer's perspective is that of an ordinary user
of the product, not necessarily the same as that of an ordinary person unfamiliar with the product."
Sauder Custom Fabrication, Inc. v. Boyd, 967 S.W.2d 349, 351 (Tex. 1998). Moreover, "[w]hen
the foreseeable users of a product have special training, a supplier has no duty to warn of risks that
should be obvious to them, even if persons without such training would not appreciate the risks." 
Humble Sand & Gravel, Inc. v. Gomez, 146 S.W.3d 170, 183 (Tex. 2004).

 The question of whether a duty exists to warn of the dangers or instruct as to the proper use
of a product is a question of law. Seagram & Sons, 814 S.W.2d at 387; Grinnell, 951 S.W.2d at 426. 
Likewise, "[w]hether a danger is open and obvious as a matter of law is an objective question for the
court to determine." Lozano, 953 S.W.2d at 314.

 Painter argues that a fact issue exists as to whether the danger relating to the rotating head
was open and obvious. Specifically, Painter argues that Robinson's standard procedure for
disassembling the rotating head was to lay down the blowout preventer stack and to leave two bolts
hand-tight in the rotating head, when doing so. Painter further argues that McGuire did not produce
any evidence that Robinson had ever had a rotating head fall before when following this procedure. 
 In Caterpillar, the plaintiff, Shears, suffered injuries while operating a front-end loader, when
he was struck by another loader. Caterpillar, 911 S.W.2d at 381. Shears brought strict-liability and
negligence claims against the manufacturer of the loader for failing to warn him of the hazards of
operating a loader without a rollover protective structure ("ROPS"). Id. at 380. The evidence
showed that Shears was an experienced operator of heavy equipment. Shears testified that he had
seen machinery equipped with a ROPS, but he thought it was to protect the operator from the
weather and had no idea of the risks of operating a front-end loader without a ROPS. Id. at 383. The
Supreme Court held that Caterpillar did not, as a matter of law, have a duty to warn. Id. That Shears
was an experienced heavy equipment operator who had apparently never been injured by virtue of 
operating a loader without ROPS did not preclude a finding that the danger of collision was obvious. 
Similarly, the fact that Robinson had previously removed the blowout preventer stack by tipping it
over does not preclude a determination that the risks involved in tipping over a rotating head secured
by two hand-tight bolts were obvious. As discussed above, the question of whether a risk is open
and obvious is an objective one. Lozano, 953 S.W.2d at 314.

 The evidence is undisputed that the rotating head was secured by no more than two hand-tight bolts at the time the drilling crew attempted to tip over the blowout preventer stack. The
evidence is also undisputed that the portion of the rotating head that struck Appellants weighed
approximately 1,500 pounds. We conclude that the dangers of an object of that weight, secured only
by two hand-tight bolts, falling when tipped over from the top of a drilling rig are open and obvious. 
See Hanus, 71 S.W.3d at 880 (affirming summary judgment on marketing claim, because danger
from digging into buried power lines was both obvious and commonly known); Ritz Car Wash, Inc.
v. Kastis, 976 S.W.2d 812, 814 (Tex. App.--Houston [1st Dist.] 1998, pet. denied) (mechanic with
over forty years' experience, who was burned while draining gasoline from gas tank, could not
prevail on marketing defect claim, because flammability of gasoline was obvious); Coleman v.
Cintas Sales Corp., 100 S.W.3d 384, 386 (Tex. App.--San Antonio 2002, pet. denied) (holding, as
a matter of law, that it is commonly known that non-flame retardant clothing will burn if exposed
to a flame). We overrule this issue.

4. Painter's Negligence Claim


 Painter's negligence claim was also based on McGuire's alleged failure to warn and instruct.
On appeal, Painter makes the same arguments that he makes with regard to his marketing claim. The
elements of a claim for negligence are the existence of a duty, breach of that duty, and damages
proximately caused by that breach. Garcia v. El Paso Ltd. P'ship, 203 S.W.3d 432, 435-36 (Tex.
App.--El Paso 2006, no pet.).

 In the context of Painter's claim, the threshold question is whether McGuire owed a legal
duty to warn of the alleged danger associated with the rotating head. See Morgan v. Wal-Mart
Stores, Inc., 30 S.W.3d 455, 461 (Tex. App.--Austin 2000, pet. denied). Whether a duty exists is
a question of law for the court. Garcia, 203 S.W.3d at 436. Because we have already concluded that
McGuire did not have a duty to warn with regard to Painter's strict-liability claim, we hold that
McGuire is not liable under Painter's negligent failure to warn claim. See Sauder, 967 S.W.2d at
351 (refusing to allow recovery on either products-liability or negligent failure-to-warn claims, when
risk was obvious to average consumer). We overrule this issue.


III. CONCLUSION


 The judgment of the trial court is affirmed.


 KENNETH R. CARR, Justice


November 20, 2008


Before Chew, C.J., McClure, and Carr, JJ.


1. Perkins settled her claims against Xact and McGuire prior to this appeal.
2. The relevant portions of chapter 95, upon which Momentum and Xact rely, provide as follows:


 In this chapter:

 (1) "Claim" means a claim for damages caused by negligence, including a counterclaim,
cross-claim, or third party claim.

 (2) "Claimant" means a party making a claim subject to this chapter.

 (3) "Property owner" means a person or entity that owns real property primarily used for
commercial or business purposes.


Tex. Civ. Prac. & Rem. Code Ann. § 95.001.


 This chapter applies only to a claim:

 (1) against a property owner, contractor, or subcontractor for personal injury, death, or
property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or
subcontractor; and

 (2) that arises from the condition or use of an improvement to real property where the
contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.


Tex. Civ. Prac. & Rem. Code Ann. § 95.002.


 A property owner is not liable for personal injury, death, or property damage to a contractor,
subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or
modifies an improvement to real property, including personal injury, death, or property damage arising
from the failure to provide a safe workplace unless:

 (1) the property owner exercises or retains some control over the manner in which the work
is performed, other than the right to order the work to start or stop or to inspect progress or receive
reports; and

 (2) the property owner had actual knowledge of the danger or condition resulting in the
personal injury, death, or property damage and failed to adequately warn.


Tex. Civ. Prac. & Rem. Code Ann. § 95.003.
3. Where the trial court grants a summary judgment without stating its grounds for doing so, we will affirm, if
any of the theories advanced below is meritorious. See Harwell v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d 170, 173
(Tex. 1995).
4. Momentum brought separate motions against Painter and Perkins, each of which included both no-evidence
and traditional summary judgment grounds. The motions are substantially similar.
5. Section 162.003 creates a trust fund of monies paid to contractors for work performed by certain beneficiaries
who furnish labor or material for the construction or repair of an improvement on real property. Tex. Prop. Code Ann.
§ 162.003.
6. Tony Painter is the father of Appellant Dusty Ray Painter.
7. Appellants also argue that Xact is contractually liable to Appellants by virtue of the terms of the Drilling
Contract. However, as noted above, Appellants did not assert a contract claim against Momentum or Xact.
8. In his summary judgment response, Painter addressed only his claims that related to McGuire's alleged failure
to warn or instruct.